886 So.2d 340 (2004)
Governor John Ellis "Jeb" BUSH; Attorney General Charlie Crist; Chief Financial Officer Tom Gallagher; Commissioner of Agriculture Charles H. Bronson, in their official capacities; the Florida Department of Education; and the State Board of Education, Brenda McShane, Dermita Merkman, Tracy Richardson, Sharon Mallety, Barbara Landrum, on behalf of themselves and minor children; and Urban League of Greater Miami, Inc., Appellants,
v.
Ruth D. HOLMES, Gregory and Susan Watson, Rebecca Hale, John Rigsby, Queen E. Nelson, Samuel Watts, Linda Lerner, Betsy H. Kaplan, on behalf of themselves and minor children; Florida State Conference of Branches of NAACP; Citizens' Coalition for Public Schools; The Florida Congress of Parents and Teachers (a/k/a "Florida PTA"); League of Women Voters of Florida, Inc.; Florida Education Association/United, AFT AFL-CIO, a labor organization and Florida taxpayer; Pat Tornillo, Jr., Andy Ford, Rita Moody, Mary Lopez, and Robert F. Lee, as Florida taxpayers, Appellees.
Nos. 1D02-3160, 1D02-3163, 1D02-3199.
District Court of Appeal of Florida, First District.
November 12, 2004.
*343 Barry Richard, Greenberg Traurig, P.A., Tallahassee; Charlie Crist, Attorney General, Christopher M. Kise, Solicitor General, Office of the Attorney General, Tallahassee; Raquel A. Rodriguez, General Counsel, Office of the Governor, Tallahassee; and Daniel Woodring, General Counsel, Florida Department of Education, Tallahassee, for Appellants Governor Jeb Bush, et al.
Kenneth W. Sukhia, Fowler, White, Boggs, Banker, P.A., Tallahassee; Clint Polick, Clark M. Neily, Robert M. Freedman, Institute for Justice, Washington, DC, for Appellants Brenda McShane, et al.
Ronald G. Meyer, Meyer and Brooks, P.A., Tallahassee; Robert H. Chanin, John M. West, and Alice O'Brien, of Bredhoff & Kaiser, P.L.L.C., Washington, DC; Pamela L. Cooper of Florida Education Association, Tallahassee; Randall Marshall of American Civil Liberties Union Foundation of Florida, Inc., Miami; Joan Peppard of Anti-Defamation League, Miami; Steven Freeman and Steven Sheinberg of Anti-Defamation League, New York, NY; Steven K. Green and Ayesha N. Khan of Americans United for Separation of Church and State, Washington, DC; Jeffrey P. Sinensky and Kara H. Stein of American Jewish Committee, New York, NY; Elliot M. Mincberg and Judith E. Schaeffer, of People for the American Way Foundation, Washington, DC; Steven R. Shapiro of American Civil Liberties Union Foundation, New York, NY; David Strom of American Federation of Teachers, Washington, DC; Michael A. Sussman of National Association for the Advancement of Colored People, Goshen, NY; Marc D. Stern of American Jewish Congress, New York, NY; Julie Underwood of National School Boards Association, Alexandria, VA, for Appellees.
Frank A. Shepherd, Independent Voices for Better Education, Teachers for Better Education, Ira J. Paul, Robert N. Wright, and Pacific Legal Foundation, Coral Gables, Amici Curiae.

ON MOTION FOR REHEARING EN BANC
VAN NORTWICK, J.
Having considered en banc the arguments raised in this appeal, we withdraw our previous majority opinion and issue the following en banc opinion.
Governor John Ellis ("Jeb") Bush, Attorney General Charlie Crist, Chief Financial Officer Tom Gallagher and Commissioner of Agriculture Charles H. Bronson, as and constituting the Florida Cabinet; the Florida Department of Education; and the Florida Board of Education appeal a final summary judgment in which the trial court ruled that the Florida Opportunity Scholarship Program (OSP), section 229.0537, Florida Statutes (1999), facially violated article I, section 3 of the Florida Constitution. The central issue before us in this appeal is whether the OSP violates the last sentence of article I, section 3 of the Florida Constitution, the so-called "no-aid" provision, which mandates that "[n]o revenue of the state ... shall ever be taken from the public treasury directly or indirectly in aid ... of any sectarian institution." *344 The appellants argue that article I, section 3, in its entirety, including the no-aid provision, imposes no greater restrictions on state aid to religious schools than does the Establishment Clause in the United States Constitution and that, as a result, the summary judgment must be reversed on the authority of the recent decision of the United States Supreme Court in Zelman v. Simmons-Harris, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), in which the court held an Ohio parental choice voucher program constitutional under the Establishment Clause. Further, the appellants argue that, if the no-aid provision is interpreted to prohibit the use of state funds to provide OSP vouchers for students attending sectarian schools, the provision would violate the Free Exercise Clause of the First Amendment. Because we cannot read the entirety of article I, section 3 of the Florida Constitution to be substantively synonymous with the federal Establishment Clause, we find the appellants' arguments without merit.
The first sentence of article I, section 3 of the Florida Constitution is synonymous with the federal Establishment Clause in generally prohibiting laws respecting the establishment of religion. In addition to the Establishment Clause language, article I, section 3 also includes the language of the no-aid provision, which expands the restrictions in state aid and to religion by specifically prohibiting the expenditure of public funds "directly or indirectly" to aid sectarian institutions. For a court to interpret the no-aid provision of article I, section 3 as imposing no further restrictions on the state's involvement with religious institutions than the Establishment Clause, it would have to ignore both the clear meaning and intent of the text and the unambiguous history of the no-aid provision. There is no dispute in this case that state funds are paid to sectarian schools through the OSP vouchers. Thus, we hold the OSP unconstitutional under the no-aid provision to the extent that the OSP authorizes state funds to be paid to sectarian schools. Finally, based upon the recent United States Supreme Court decision in Locke v. Davey, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004), we hold that the no-aid provision does not violate the Free Exercise clause of the United States Constitution. Accordingly, we affirm the decision of the trial court and certify a question of great public importance to the Florida Supreme Court.

I. Procedural History

Various parents of children in Florida elementary and secondary schools and several organizations,[1] appellees, filed a complaint seeking declaratory and injunctive relief challenging the facial constitutionality of the OSP, section 229.0537, Florida Statutes (1999). In their action, circuit court case number 99-3370, these plaintiffs asserted that the OSP was violative of article I, section 3 and article IX, section 1 of the Florida Constitution as well as the Establishment Clause of the First Amendment to the United States Constitution and 42 U.S.C. section 1983. The members of the Florida Cabinet and the Florida Department of Education were named as defendants.
In a separate action, circuit court case number 99-4110, other plaintiffs, also appellees, including the Florida Education Association/United, AFT AFL-CIO, and various individuals also challenged the OSP under the state and federal constitutions. The Florida Cabinet members, the *345 State Board of Education, and the Florida Department of Education were named as defendants. These two proceedings were consolidated, and the parents and guardians of students who had received vouchers under the OSP were allowed to intervene.
The trial court first considered the question of whether the OSP was facially constitutional under the provisions of article IX, section 1 of the Florida Constitution, which required that "[a]dequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools...."[2] After receiving argument, the trial court ruled that "[s]ection 229.0537, Fla. Stat., insofar as it establishes a program through which the State pays tuition for certain students to attend private schools, is declared to be unconstitutional on its face under Article IX,  1 of the Florida Constitution."
In the first appeal of this case, this court reversed, explaining that "nothing in article IX, section 1 clearly prohibits the Legislature from allowing the well-delineated use of public funds for private school education, particularly in circumstances where the Legislature finds such use is necessary." Bush v. Holmes, 767 So.2d 668, 675 (Fla. 1st DCA 2000)(footnote omitted). Specifically declining to consider the other constitutional arguments raised by the plaintiffs, this court remanded the cause to the trial court for its consideration of the remaining issues.
While the cause was pending on remand, the United States Supreme Court issued its decision in Zelman v. Simmons-Harris holding constitutional under the Establishment Clause the Ohio Pilot Project Scholarship Program, under which parents of Cleveland schoolchildren can receive a tuition voucher redeemable either in participating Cleveland private schools or public schools in districts adjacent to Cleveland. Thereafter, the plaintiffs voluntarily dismissed their challenges under the Establishment Clause of the First Amendment to the United States Constitution and under article IX, section 6 of the Florida Constitution. Thus, the only issue then remaining was whether the OSP was facially constitutional under the provisions of article I, section 3 of the Florida Constitution prohibiting the use of state revenues directly or indirectly in aid of sectarian institutions. Following discovery and hearing, the trial court ruled that the OSP is violative of article I, section 3 of the Florida Constitution.[3]
*346 In its final summary judgment, the trial court found that
the vast majority of students participating in the OSP (47 of 51) have enrolled in "sectarian institutions" of learning in Escambia County. This allegation had previously been admitted by Defendants in pleadings and is not in dispute.
Appellants have not taken issue with this finding of the trial court.
The trial court further found that
[w]hile there is no evidence or assertion that any of the schools would cease to operate without the benefit of the OSP funds, that is not the test. It cannot logically, legally, or persuasively be argued that the receipt of these funds does not aid or assist the institution in a meaningful way. The entire educational mission of these schools, including the religious educational component, is advanced and enhanced by the additional, financial support received through operation of the Opportunity Scholarship Program.
Appellants do not take specific issue with this finding either, although appellants suggest that any benefit received is de minimis or is incidental to the benefit available to the public in general.
The trial court further found that the "funds disbursed under the OSP emanate directly from the revenue of Florida and its political subdivisions" and that such disbursements result "in a dollar for dollar reduction in the funds of the public school or school district" where the student of the recipient parent was enrolled. Thus, the "funds are without question revenue `taken from the public treasury' of a political subdivision" and are hence distinguishable from the type of state aid found constitutional in Nohrr v. Brevard County Educational Facilities Authority, 247 So.2d 304 (Fla.1971), and Johnson v. Presbyterian Homes of Synod of Florida, Inc., 239 So.2d 256 (Fla.1970). The trial court expressly rejected the argument that, because state funds are disbursed to the parent or guardian of a student who then restrictively endorses the state warrant to the private school of choice, OSP does not directly or indirectly benefit any particular church, religious denomination or sectarian institution. The trial court declared section 229.0537 facially unconstitutional and enjoined appellants from taking any action to implement the OSP.[4]

*347 II. The Florida Opportunity Scholarship Program

In section 229.0537(1), Florida Statutes (1999), the Florida Legislature described the purpose for establishing the OSP, in part, as follows:
The Legislature finds that the State Constitution requires the state to provide the opportunity to obtain a high-quality education. The Legislature further finds that a student should not be compelled, against the wishes of the student's parent or guardian, to remain in a school found by the state to be failing for 2 years in a 4-year period.
The Legislature created the OSP to allow a student attending a "failing" public school to attend a private school, sectarian or non-sectarian, with the financial assistance of the state. Under the OSP, the state
make[s] available opportunity scholarships in order to give parents and guardians the opportunity for their children to attend a public school that is performing satisfactorily or to attend an eligible private school when the parent or guardian chooses to apply the equivalent of the public education funds generated by his or her child to the cost of tuition in the eligible private school....
 229.0537(1), Fla. Stat. (1999). Thus, when a school is found by the state to be a "failing" school during two years of a four-year period, the school is required to notify parents and guardians of students attending such a failing school of the opportunity to enroll in a public school within the district which is not failing, or of the opportunity to receive a "scholarship," that is, a tuition voucher, by which a student may attend a private school.  229.0537(2)-(4), Fla. Stat. (1999).
For the student attending a private school with assistance under the OSP, a state warrant is made payable to a student's parent or guardian and is mailed by the Department of Education directly to the private school chosen by the parent or guardian; the parent or guardian then is to restrictively endorse the warrant to the private school.  229.0537(6)(b), Fla. Stat. (1999). The private schools participating in the OSP have specified requirements, including an agreement "not to compel any student attending the private school on an opportunity scholarship to profess a specific ideological belief, to pray, or to worship."  229.0537(4), Fla. Stat. (1999).

III. Article I, Section 3

Article I, section 3 of the Florida Constitution provides:
Religious Freedom. ÔÇö There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety. No revenue of the state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution.
As explained in the Commentary to this section, the first sentence of section 3 is "akin to the first clause in the First Amendment of the U.S. Constitution." Talbot "Sandy" D'Alemberte, Commentary, *348 art. I,  3, 25A Fla. Stat. Annot. 79 (1991).[5] The second sentence is a continuation of the limitation on the exercise of religion which first appeared in the 1868 Florida Constitution, the so-called "Reconstructionist Constitution." See id. As for the third and last sentence, it is "much the same as under section 6 of the 1885 Constitution," id., and there is no analogue to this provision in the federal constitution. Only the third and last sentence of article I, section 3, the no-aid provision, is pertinent in the case at bar because it is that provision which was the basis for the trial court's ruling before us.[6]

A. Historical Context for the No-Aid Provision.

There exists no record from the constitutional convention that incorporated the no-aid provision into the 1885 Florida Constitution. Nevertheless, history tells us a great deal about the origins and intent of the no-aid provision which can assist us in its interpretation. See State v. Butler, 70 Fla. 102, 69 So. 771, 777 (Fla.1915)("In construing and applying provisions of a Constitution the leading purpose should be to ascertain and effectuate the intent and object designed to be accomplished.... Every word of a state Constitution should be given its intended meaning and effect....").
Florida's no-aid provision was adopted into the 1868 Florida Constitution during the historical period in which so-called "Blaine Amendments"[7] were commonly *349 enacted into state constitutions.[8] The primary purpose of these amendments to the various state constitutions was to bar the use of public funds to support religious schools. Justice Brennan discussed this history, observing that the "subsidy of sectarian educational institutions became embroiled in bitter controversies very soon after the Nation was formed." Lemon v. Kurtzman, 403 U.S. 602, 645, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)(Brennan, J., concurring). Into the 19th century, state governments looked to the church to provide education, often with government aid, and political disputes frequently arose over which churches or sectarian organizations should receive public assistance. Id. at 645-46, 91 S.Ct. 2105.
The Nation's rapidly developing religious heterogeneity, the tide of Jacksonian democracy, and growing urbanization soon led to widespread demands throughout the States for secular public education. At the same time strong opposition developed to the use of the States' taxing powers to support private sectarian schools. Although the controversy over religious exercises in the public schools continued into this century, the opponents of subsidy to sectarian schools had largely won their fight by 1900. In fact, after 1840, no efforts of sectarian schools to obtain a share of public school funds succeeded. Between 1840 and 1875, 19 States added provisions to their constitutions prohibiting the use of public school funds to aid sectarian schools, and by 1900, 16 more States had added similar provisions. In fact, no State admitted to the Union after 1858, except West Virginia, omitted such provision from its first constitution. Today fewer than a half-dozen States omit such provisions from their constitutions.
Id. at 646-47, 91 S.Ct. 2105 (citations and footnote omitted).
The various amendments in state constitutions evidence a wide diversity in language and scope, but all contained a form of restriction on state financial support to religions or religious institutions. Most states adopted provisions less restrictive than the Florida no-aid provision. Generally, the less restrictive language in state constitutions was limited to ensuring that public education was free of sectarian instruction and prohibiting direct public funding of private religious schools or institutions, see, e.g., Mass. Const. Amend. art. 18 ("No grant, appropriation or use of public money or property or loan of credit shall be made or authorized by the commonwealth or any political subdivision thereof for the purpose of founding, maintaining or aiding any infirmary, hospital, institution, primary or secondary school, or charitable or religious undertaking which is not publicly owned and under the exclusive control, order and supervision of public officers or public agents authorized by the Commonwealth or federal authority or both...."); see generally, Mark Edward DeForrest, An Overview and Evaluation of State Blaine Amendments: Origins, Scope, and First Amendment Concerns, 26 Harv. J.L. & Pub. Pol'y 551, 576-78 (2003). Other provisions expressly allow limited government assistance with either basic transportation or higher education. See, *350 e.g., N.J. Const. art. 8,  4, par. 3 ("The Legislature may, within reasonable limitations as to distance to be prescribed, provide for the transportation of children within the ages of five to eighteen years inclusive to and from any school."); West Morris Reg'l Bd. of Educ. v. Sills, 58 N.J. 464, 279 A.2d 609, 612 (1971), cert. denied, 404 U.S. 986, 92 S.Ct. 450, 30 L.Ed.2d 370 (1971)(recognizing that New Jersey Constitution article 8,  4, par. 3 authorizes the state to provide transportation of students to public and private schools.). The amendments in other state constitutions prohibit direct funding of religious institutions or schools, "but leave open, at least in their constitutional texts, the question of whether or not indirect state funding, such as vouchers, are permissible." DeForrest, 26 Harv. J.L. & Pub. Pol'y at 578. As Professor DeForrest observes, the most restrictive state constitutional provisions, like the Florida no-aid provision, "go far beyond the prohibition of direct aid to schools by preventing indirect aid as well ... [and by] ... prohibiting aid not only to the schools, but also to any religious or `sectarian' institution." Id. at 587. The Florida and Georgia Constitutions both include the express prohibition of "indirect" aid. See art. I,  2, para. VII, Ga. Const. ("No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect, cult or religious denomination or of any sectarian institution.").
In its recent opinion in Locke v. Davey, the United States Supreme Court has recognized that state constitutional amendments such as Florida's no-aid provision prohibit the state from using tax dollars to support religious institutions. As discussed in more detail in section VII below, in Locke, the court held that the provision of the Washington Constitution prohibiting the use of "public money or property" to support "any religious worship, exercise or instruction, or the support of any religious establishment," article I, section 11, Washington Constitution, did not violate the Free Exercise Clause of the United States Constitution. Chief Justice Rehnquist discussed the purpose and history of Washington's constitutional provision and similar state constitutional provisions, as follows:
Even though the differently worded Washington Constitution draws a more stringent line than that drawn by the United States Constitution, the interest it seeks to further is scarcely novel. In fact, we can think of few areas in which a State's antiestablishment interests come more into play. Since the founding of our country, there have been popular uprisings against procuring taxpayer funds to support church leaders, which was one of the hallmarks of an "established" religion. See R. Butts, The American Tradition in Religion and Education 15-17, 19-20, 26-37 (1950); F. Lambert, The Founding Fathers and the Place of Religion in America 188 (2003)("In defending their religious liberty against overreaching clergy, Americans in all regions found that Radical Whig ideas best framed their argument that state-supported clergy undermined liberty of conscience and should be opposed"); see also J. Madison, Memorial and Remonstrance Against Religious Assessments, reprinted in Everson v. Board of Ed. of Ewing, 330 U.S. 1, 65, 68, 67 S.Ct. 504, 91 L.Ed. 711 (1947)(appendix to dissent of Rutledge, J.)(noting the dangers to civil liberties from supporting clergy with public funds).
Most States that sought to avoid an establishment of religion around the time of the founding placed in their constitutions formal prohibitions against using tax funds to support the ministry. E.g., Ga. Const. Art. IV,  5 (1789), reprinted *351 in 2 Federal and State Constitutions, Colonial Charters and Other Organic Laws 789 (F. Thorpe ed.1909)(reprinted 1993)("All persons shall have the free exercise of religion, without being obliged to contribute to the support of any religious profession but their own"); Pa. Const., Art. II (1776) in 5 id., at 3082 ("[N]o man ought or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any ministry, contrary to, or against, his own free will and consent"); N.J. Const., Art. XVIII (1776), in id., at 2597 (similar); Del. Const., Art. I,  1 (1792), in 1 id., at 568 (similar); Ky. Const., Art. XII,  3 (1792), in 3 id., at 1274 (similar); Vt. Const., Ch. I, Art. 3 (1793), in 6 id., at 3762 (similar); Tenn. Const., Art. XI,  3 (1796), in id., at 3422 (similar); Ohio Const., Art. VIII,  3 (1802), in 5 id., at 2910 (similar). The plain text of these constitutional provisions prohibited any tax dollars from supporting the clergy.
124 S.Ct. at 1313-14 (footnotes omitted).
Given this historical context and the highly restrictive language in Florida's no-aid provision, the drafters of the no-aid provision clearly intended at least to prohibit the direct or indirect use of public monies to fund education at religious schools.
In addition, the legislative history of the most recent general revision of the Florida Constitution in 1966-68, included in pertinent part in the record on appeal, confirms that the no-aid language was intended to impose restrictions beyond what is restricted by the federal Establishment Clause. The proposed revised Constitution forwarded to the Florida Legislature by the Constitution Revision Commission ("CRC") omitted what is now the final sentence of article I, section 3. See Fla. H.R. Jour. 1-3 (Extra.Sess.1967). This omission would have had the effect of equating the language of article I, section 3 with the language of the federal Establishment Clause. The legislature revised the CRC's draft, however, to retain the no-aid prohibition in addition to the Establishment Clause language. See H. Amend. 3 to Fla. H.R. 3-XXX (1967). By retaining the specific prohibition on using public funds to support sectarian institutions contained in the 1885 Constitution in addition to the Establishment Clause language, the legislature ÔÇö and subsequently the electorate, which ratified the Constitution of 1968 ÔÇö made clear that article I, section 3 necessarily imposes restrictions beyond the Establishment Clause.[9]

*352 B. The Language of the No-Aid Provision.

Our interpretation of the no-aid provision must start with its text. See Florida Soc'y of Ophthalmology v. Florida Optometric Ass'n, 489 So.2d 1118, 1119 (Fla.1986)("Any inquiry into the proper interpretation of a constitutional provision must begin with an examination of that provision's explicit language."); see also In Re Advisory Opinion to Governor Request of June 29, 1979, 374 So.2d 959, 964 (Fla.1979)("In construing provisions of the constitution, each provision must be given effect, according to its plain and ordinary meaning. The court must give provisions a reasonable meaning, tending to fulfill, not frustrate, the intent of the framers and adopters."); Shriners Hosps. for Crippled Children v. Zrillic, 563 So.2d 64, 67 (Fla.1990). The constitutional prohibition in the no-aid provision involves three elements: (1) the prohibited state action must involve the use of state tax revenues; (2) the prohibited use of state revenues is broadly defined, in that state revenues cannot be used "directly or indirectly in aid of" the prohibited beneficiaries; and (3) the prohibited beneficiaries of the use of state revenues are "any church, sect or religious denomination" or "any sectarian institution." We will examine each element separately.
Use of State Revenues. First, the no-aid provision focuses on the use of state funds to aid sectarian institutions, not on other types of support. As the trial court found, it is undisputed that the OSP uses state revenues to fund vouchers that are paid to private schools chosen by the parents or guardians of students. It is this use of state revenues which distinguishes the OSP from the facts in other cases in which the state has provided assistance to a religious or secular institution. See section IV below.
Directly or Indirectly. Second, the express prohibition of direct and indirect aid to churches, religions, sects or sectarian institutions in the no-aid provision evidences a clear intent by the drafters to bar a broad range of uses of state revenues to benefit sectarian organizations. The common meaning of "indirect" is "[n]ot directly planned for; secondary: indirect benefits." American Heritage Dictionary of the English Language, 670 (1979)(emphasis added). Thus, the legislature need not use state revenues to provide direct financial aid to sectarian institutions for the OSP to violate the no-aid provision. An indirect or secondary benefit to sectarian institutions from the use of state funds would be sufficient to violate the provision.
Appellants argue that the OSP does not constitute direct or indirect aid to any sectarian institution because the vouchers are made payable to parents, who make the choice of the school in which to enroll their children. Even though the OSP gives parents and guardians a choice as to which school to apply a tuition voucher, under the OSP statute the parents must restrictively endorse the voucher to the school, and the voucher funds are then *353 paid by the state to the school. Because of the broad language of the no-aid provision, prohibiting the use of state revenues "directly and indirectly" in aid of secular institutions, such an indirect path for the aid does not remove the OSP from the restrictions of the no-aid provision.
Appellants further argue that the funds from the OSP vouchers do not even incidentally benefit sectarian schools receiving the voucher payments. Appellants reason that, because the record in this case shows that voucher payments to schools do not cover the full cost of educating the student and the "shortfall" in the cost is subsidized by the schools or another source, the voucher payments cannot constitute "aid" as a matter of law. We cannot agree, and adopt the reasoning of the trial court set forth in the order on appeal:
While there is no evidence or assertion that any of the schools would cease to operate without the benefit of the OSP funds, that is not the test. It cannot be logically, legally, or persuasively argued that the receipt of these funds does not aid or assist the institution in a meaningful way. The entire educational mission of these schools, including the religious education component, is advanced and enhanced by the additional, financial support received through operation of the Opportunity Scholarship Program.
Any Sectarian Institution. Third, the no-aid provision prohibits not only aid to "any church, sect or religious denomination," but also aid to "any sectarian institution."[10] Thus, the no-aid provision does not create a constitutional bar to the payment of an OSP voucher to a non-sectarian school, if the state funds do not aid indirectly a religion, church or sect which owns or operates the school. On the other hand, because an OSP voucher is used to pay the cost of tuition, any disbursement made under the OSP and paid to a sectarian or religious school is made in aid of a "sectarian institution," the school itself, even if it can be shown that no voucher funds benefit or support a church or religious denomination. See State ex rel. Gallwey v. Grimm, 146 Wash.2d 445, 48 P.3d 274, 279 (2002)("Neither party seriously disputes that the EOG Program [which provides tuition grants for upper division course work for use at public or private institutions to students who have completed an associate of arts degree or its equivalent and are considered financially needy] supports the subject colleges and universities with public funds."); Hartness v. Patterson, 255 S.C. 503, 179 S.E.2d 907, 909 (1971)(holding that use of public funds to provide tuition grants to students attending participating religious institutions constituted "aid" to such institutions within meaning of, and prohibited by, article of state constitution prohibiting use of public money, directly or indirectly, to aid institutions of higher learning controlled by sectarian groups); Almond v. Day, 197 Va. 419, 89 S.E.2d 851, 857 (1955)(rejecting *354 view that private institutions whose students use public-funded tuition vouchers receive no direct benefit from the payment of tuition and institutional fees at such schools because "[t]uition and institutional fees go directly to the institution and are its very life blood.").
The appellants do not dispute that sectarian schools receive state funds from OSP vouchers. The record reflects that the vast majority of the schools receiving state funds from OSP vouchers at the time of the hearing below are operated by religious or church groups with an intent to teach to their attending students the religious and sectarian values of the group operating the school. Evidence of record demonstrates, for example, that during the OSP's first three years, ninety percent of the students in Escambia County who utilized an OSP voucher were enrolled in a school operated by the Diocese of Pensacola-Tallahassee, a unit of the Catholic Church. The record further reflects that the mission of the Pensacola-Tallahassee Diocesan school system, according to its written Mission Statement, is
to collaborate with parents in the Christian formation of students passing on to them the message of Christ taught by the Catholic Church. This is done in the context of Christian community which worships together, fosters service and strives to achieve academic excellence.
The Diocese's "Philosophy of Education" is stated, in part, as follows:
The Diocese of Pensacola-Tallahassee sponsors pre-schools, elementary and secondary schools in Northwest Florida, dedicated to forming youth in the Catholic faith, developing Gospel values and fostering academic excellence.

IV. Case Law Interpreting Article I, Section 3

There is not a substantial body of case law interpreting the Florida no-aid provision. Appellants argue, and the dissent agrees, that reversal is required by the holdings of the Florida Supreme Court in Koerner v. Borck, 100 So.2d 398 (Fla.1958); Nohrr v. Brevard County; Johnson v. Presbyterian Homes; and Southside Estates Baptist Church v. Board of Trustees, 115 So.2d 697 (Fla.1959). Because none of these cases involve the use of state revenues to aid a sectarian institution, we find all of these cases distinguishable from the case on appeal.
In Koerner, a testamentary devise of real property to a Florida county for use as a public park was challenged. The will making the devise contained an easement pursuant to which a local church would retain the ability to use the lake located in the devised real estate for conducting baptisms and for recreational purposes. The Florida Supreme Court rejected the contention that the County could not, consistently with the Establishment Clause of the First Amendment to the United States Constitution, accept a devise of land for use as a park when the devise carries with it a perpetual easement to use part of the property for baptismal purposes. Koerner, 100 So.2d at 401. In addition, the supreme court held that the devise was not subject to attack under section 6 of the Declaration of Rights of the 1885 Constitution, which was still in effect when Koerner was decided. This provision "prohibit[ed] the expenditure of public funds, directly or indirectly, in aid of any church, sect, religious denomination, or sectarian institution," and the supreme court reasoned that "any improvement to the county-owned land will be made for the benefit of the people of the county and not for the church." Id. at 402. Thus, the court found no state aid flowing to the church. In addition, Koerner did not involve a specific disbursement to improve the park *355 made from the public treasury, though in dicta the Koerner court stated that a disbursement to improve the park would not, under the facts of that case, render the devise unconstitutional.
In Nohrr, a citizen challenged the "Higher Educational Facilities Authorities Law," section 243.18, et seq., Florida Statutes (1969), by which Florida counties, upon a declaration of need and public purpose, were permitted to create a "County Educational Facilities Authority" which would assist institutions of higher education in obtaining financing to develop or expand their educational facilities. 247 So.2d at 306. In Nohrr, the Florida Institute of Technology sought assistance from the County Authority, which adopted a resolution authorizing the issuance of $880,000 in revenue bonds. The Higher Educational Facilities Authorities Law was challenged as being violative of the First Amendment to the U.S. Constitution and of article 1, section 3 of the Florida Constitution. The supreme court held:
A state cannot pass a law to aid one religion or all religions, but state action to promote the general welfare of society, apart from any religious considerations, is valid, even though religious interests may be indirectly benefited. If the primary purpose of the state action is to promote religion, that action is in violation of the First Amendment, but if a statute furthers both secular and religious ends, an examination of the means used is necessary to determine whether the state could reasonably have attained the secular end by means which do not further the promotion of religion. Johnson v. Presbyterian Homes of Synod of Fla., Inc., 239 So.2d 256 (Fla.1970). See also, Murray v. Comptroller of Treasury, 241 Md. 383, 216 A.2d 897 (1966) (cert. den. sub nom. Murray v. Goldstein, 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d 55). Walz v. Tax Commission of the City of New York, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).
The Educational Facilities Law does not violate the First Amendment to the United States Constitution nor does it do violence to Art. 1, s. 3, of the Florida Constitution.
247 So.2d at 307.
The issuance of revenue bonds to support centers of higher education, however, regardless of whether they are sectarian or non-sectarian, is not the payment of money from the revenue of the public treasury "directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution" as prohibited by article I, section 3.
In Johnson, a statute granting a property tax exemption to non-profit nursing homes, which was the basis for a tax exemption accorded to a facility owned by the Presbyterian Synod of Florida, was challenged as being violative of article I, section 3 of the Florida Constitution as well as the Establishment Clause of the federal constitution. 239 So.2d at 258-259. After quoting extensively from Walz v. Tax Commission of New York, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), in which the United States Supreme Court held that a property tax exemption did not run afoul of the First Amendment, the Florida Supreme Court upheld the constitutionality of the property tax exemption statute at issue, finding that it was enacted to promote the general welfare and that any benefit received by a religious denomination was incidental to the achievement of a public purpose. 239 So.2d at 261. The supreme court did not specifically address the no-aid provision in article I, section 3, and analyzed the case using considerations developed in Establishment Clause jurisprudence. The statute at issue in Johnson, unlike the statute at issue here, did *356 not involve a disbursement from the public treasury.
In Southside Estates Baptist Church, a decision by the Board of Trustees of a school tax district in Duval County to allow several churches to use various school buildings during Sunday non-school hours was challenged as being contrary to the state constitution. It was argued that the "described use of a school building constitute[d] an indirect contribution of financial assistance to a church in violation of Section 6 of the Declaration of Rights of the Florida Constitution," which prohibited the expenditure of state funds, directly or indirectly in aid of any church, sect or religious denomination or in aid of any sectarian institution; and "contravene[d] the proscription of the First Amendment to the Constitution of the United States which prohibits any law establishing a religion." 115 So.2d at 698. Rejecting the constitutional challenge, the Supreme Court explained:
We think, however, that it is totally unnecessary to become involved in any prolonged discussion of the applicability of the separation of Church and State principle. In regard to the Florida Constitutional prohibition against contributing public funds in aid of any religious denomination, we find nothing in this record to support a conclusion that any public funds have been contributed. Taking note of appellant's insistence that the use of the building is something of value and that the wear and tear is an indirect contribution from the public treasury, it appears to us that we might here properly apply the maxim De minimis non curat lex. Nothing of substantial consequence is shown and we see no reason to burden this opinion with a discussion of trivia.
Id. at 699-700 (emphasis added). As was apparently the case in Johnson, no disbursement was made from the public treasury in Southside Estates Baptist Church, a fact which significantly distinguishes it from the instant case.
In each of the above cases, state government provided or allowed a form of assistance to a religious institution through such mechanisms as tax exemptions, revenue bonds, and similar state involvement. These forms of assistance constitute substantially different forms of aid than the transfer of public funds expressly prohibited by the no-aid provision. "In the case of direct subsidy, the state forcibly diverts the income of both believers and nonbelievers to churches. In the case of an exemption, the state merely refrains from diverting to its own uses income independently generated by the churches through voluntary contributions." Donald A. Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development, 81 Harv. L.Rev. 513, 553 (1968). Because the prohibitions of the no-aid provision are limited to the payment of public monies, this provision itself recognizes that the payment of public funds in aid of religious institutions involves an especially problematic governmental involvement in religious institutions. As Justice Brennan explained:
Tax exemptions and general subsidies, however, are qualitatively different [than the payment of state funds]. Though both provide economic assistance, they do so in fundamentally different ways. A subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole. An exemption, on the other hand, involves no such transfer. It assists the exempted enterprise only passively, by relieving a privately funded venture of the burden of paying taxes. In other words, in the case of direct subsidy, the state forcibly *357 diverts the income of both believers and nonbelievers to churches, while in the case of an exemption, the state merely refrains from diverting to its own uses income independently generated by the churches through voluntary contributions. Thus, the symbolism of tax exemption is significant as a manifestation that organized religion is not expected to support the state; by the same token the state is not expected to support the church.
Walz, 397 U.S. at 690-1, 90 S.Ct. at 1422-3 (Brennan, J., concurring) (footnotes, quotation marks, and citations omitted).[11]
The dissent asserts that City of Boca Raton v. Gidman, 440 So.2d 1277 (Fla.1983), supports reversal here. Gidman is inapposite to the instant case. Gidman addressed whether section 7.06 of the city's charter, which prohibited the expenditure of city funds "whatsoever to accrue either directly or indirectly to the benefit of any religious, charitable, benevolent, civic or service organization," prevented the city from contracting with a non-profit organization to provide a child daycare center. Id. at 1278. The city possessed broad home rule powers under Article VIII, section 2(b) of the Florida Constitution, and section 166.021(4), Florida Statutes (1979), to act for a "municipal purpose." Id. at 1280. The Supreme Court interpreted section 7.06 of the charter to allow the expenditure of city funds to a non-profit organization for childcare services consistent with the City's home rule powers. The Gidman court reasoned:
If interpreted literally, the charter limitation would hamstring the city in carrying out its governmental functions. It would prevent the city from contracting with any non-profit organization to provide municipal services. This would require the city to pay a much higher price for any service which is otherwise available through a charitable or service organization.... It is illogical to require the city to choose between contracting with a profit-making organization and thereby paying the entire cost, or not providing for the service at all. It could not have been the intention of the people to require such an inefficient allocation of economic resources. There is no danger that the city's funds would be spent for some non-municipal purpose.
Id. at 1281. The court chiefly focused on whether the providing of childcare services was within the city's municipal purpose. Id. at 1281-82. Plainly, the Gidman analysis has no application to an interpretation of the no-aid provision.

V. Article I, Section 3 of the Florida Constitution is More Restrictive than First Amendment of United States Constitution

Appellants argue that article I, section 3 of the Florida Constitution *358 should be interpreted in a manner substantively synonymous with the Establishment Clause of the First Amendment. We cannot agree. For a court to interpret the no-aid provision as adding nothing substantive to article I, section 3 of the Florida Constitution would require that court to ignore the clear meaning of the text of the provision and its formative history. See section III above. It is a fundamental principle of constitutional interpretation that "[e]very word of the Florida Constitution should be given its intended meaning and effect. In construing constitutions, that construction is favored which gives effect to every clause and every part of it. A construction which would leave without effect any part of the language used should be rejected if an interpretation can be found which gives it effect." In re: Apportionment Law Senate Joint Resol. 1305, 1972 Reg. Sess., 263 So.2d 797, 807 (Fla.1972).
In Silver Rose Entertainment, Inc. v. Clay County, 646 So.2d 246, 250-1 (Fla. 1st DCA 1994), rev. denied, 658 So.2d 992 (Fla.1995), we explained that article I, section 3 utilizes the test established in Lemon v. Kurtzman, 403 U.S. at 612-13, 91 S.Ct. at 2111, so that a statute which "passes muster under article I, section 3 of the Florida Constitution necessarily meets the federal Establishment Clause tests." However, we noted that, in addition to the three-stage Lemon test,[12] article I, section 3 "adds a fourth: The statute must not authorize the use of public moneys, directly or indirectly, in aid of any sectarian institution." Silver Rose, 646 So.2d at 251; see also Rice v. State, 754 So.2d 881, 883 (Fla. 5th DCA), rev. denied, 779 So.2d 272 (Fla.2000).[13]
The second element of the Lemon test, sometimes referred to as the "primary effects prong," Zelman v. Simmons-Harris, 536 U.S. at 669, 122 S.Ct. at 2476 (O'Connor, J., concurring), may be resolved by considering whether a statute has a neutral purpose. In cases where government aid is received by religious schools, the United States Supreme Court has drawn a distinction between those programs which provide aid directly to religious schools and those programs which provide aid by means of a genuine and independent private choice of an individual. In the latter programs, such aid has been found not to run afoul of the Establishment Clause. See Mueller v. Allen, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983); Witters v. Washington Dep't of Servs. for Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986); Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, *359 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993); Zelman.
If article I, section 3 of the Florida Constitution was coterminous with the First Amendment to the United States Constitution, our inquiry in this case would be decidedly different, and a reversal would be mandated under Zelman.[14] If we were resolving this case purely on Establishment Clause principles, the fact that the OSP program on its face has a religiously neutral purpose ÔÇö to aid children in failing public schools ÔÇö and the fact that the OSP gives parents or guardians the freedom of choice in selecting an alternative to a failing public school, would be dispositive factors, without regard to whether a disbursement was made directly to a parent or guardian rather than the school. As Justice Thomas explained in Mitchell v. Helms, 530 U.S. 793, 815-16, 120 S.Ct. 2530, 2544-45, 147 L.Ed.2d 660 (2000):
Although some of our earlier cases, ..., did emphasize the distinction between direct and indirect aid, the purpose of this distinction was merely to prevent subsidization of religion.... [O]ur more recent cases address this purpose not through the direct/indirect distinction but rather through the principle of private choice, as incorporated in the first Agostini [v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)] criterion (i.e., whether any indoctrination could be attributed to the government). If aid to schools, even "direct aid," is neutrally available and, before reaching or benefitting any religious school, first passes through the hands (literally or figuratively) of numerous private citizens who are free to direct the aid elsewhere, the government has not provided any "support of religion...." [T]here is no reason why the Establishment Clause requires such a form.
(Citations omitted).[15]
However, article I, section 3 of Florida's Constitution is plainly not identical to the First Amendment. As explained in Silver Rose and in section III above, unlike the First Amendment and the first sentence of article I, section 3, the no-aid provision contains a broad prohibition against the expenditure of state revenues. It prohibits the use of state funds either "directly or indirectly in aid of" not only churches, religions, and sects, but any sectarian institution.
We find it significant that the United States Supreme Court has recognized that a state constitutional provision substantially *360 similar to Florida's no-aid provision is "far stricter" than the Establishment Clause, see Witters v. Washington Dep't of Servs. for the Blind, 474 U.S. at 489, 106 S.Ct. at 753,[16] and "draws a more stringent line than that drawn by the United States Constitution...." Locke, 124 S.Ct. at 1313.
In Witters, Mr. Witters, who was blind, requested financial assistance to enroll in a seminary under a program of the State of Washington which provided financial aid to disabled students. The state denied his request. 474 U.S. at 483-84, 106 S.Ct. at 749-51. The denial was upheld in the lower state tribunals based on state constitutional grounds. Id. at 484, 106 S.Ct. 748. The Washington Supreme Court affirmed, but based its decision solely on the federal Establishment Clause. See Witters v. State Comm'n for the Blind, 102 Wash.2d 624, 689 P.2d 53, 56-57 (1984), rev'd sub nom, Witters v. Washington Dep't of Servs. for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846. On review, the United States Supreme Court unanimously reversed. The Court held that the "extension of aid under Washington's vocational rehabilitation program to finance petitioner's training at a Christian college ... would [not] advance religion in a manner inconsistent with the Establishment Clause of the First Amendment." Witters, 474 U.S. at 489, 106 S.Ct. at 753. The Court nevertheless remanded the case, stating that "the state court is of course free to consider the applicability of the `far stricter' dictates of the Washington State Constitution." Id.
On remand, the Washington Supreme Court again upheld the state's decision to deny financial aid, this time on state constitutional grounds. The court rested its holding on the language of article I,  11 of the Washington Constitution, which, the court concluded, "prohibits not only the appropriation of public money for religious instruction, but also the application of public funds to religious instruction." Witters v. State Comm'n for the Blind, 112 Wash.2d 363, 771 P.2d 1119, 1122 (1989)(original emphasis omitted). The Washington court considered the language of the state constitution substantially more "sweeping and comprehensive" than the language of the Establishment Clause and, accordingly, the court reasoned that "apply [ing] federal establishment clause analysis ... would be inappropriate." Id. The United States Supreme Court subsequently denied Mr. Witters' petition for writ of certiorari. Witters v. Washington Dep't of Servs. for the Blind, 493 U.S. 850, 110 S.Ct. 147, 107 L.Ed.2d 106 (1989).
In its recent opinion in Locke, the Supreme Court has again addressed the same Washington constitutional provision that it considered in Witters. As discussed in detail in section VII infra, the Court recognized that a state constitutional provision, like Florida's no-aid provision, can preclude state financial aid to religious institutions without violating either the Establishment Clause or Free Exercise Clause. Locke, 124 S.Ct. at 1315. Thus, "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause," id. at 1311, and states are free to "draw[ ] a more *361 stringent line than drawn by the United States Constitution...." Id. at 1313.
As was the case in Witters, the supreme courts of several states have held unconstitutional under their state constitutions various forms of financial assistance involving school choice. See Opinion of the Justices (Choice in Educ.), 136 N.H.357, 616 A.2d 478, 480 (1992)(a proposal to reimburse private primary and relocating schools at a rate of 75% of the per-pupil cost of public education violates state constitution because "[n]o safeguards exist to prevent the application of public funds to sectarian uses"); Opinion of Justices to House of Representatives, 357 Mass. 846, 259 N.E.2d 564, 565-66 (1970)(a proposal to give $100 to the parents of every school age child, whether attending private or public schools, would violate article 46,  2 of commonwealth constitution, which provides that "no grant, appropriation or use of public money or property ... shall be made or authorized by the commonwealth or any political division thereof for the purpose of founding, maintaining or aiding ... any school... or educational ... undertaking which is not publicly owned"); and Chittenden Town School Dist. v. Dep't of Educ., 169 Vt. 310, 738 A.2d 539, 562 (1999)(holding unconstitutional state statute authorizing school districts to provide high school education by paying tuition for non-public schools selected by parents under Chapter 1, article 3 language of the Vermont Constitution, which provides, in relevant part, that "no person ought to, or of right can be compelled to... support any place of worship ... contrary to the dictates of conscience").
Appellants argue that we should find persuasive the holding and reasoning of the Wisconsin Supreme Court in Jackson v. Benson, 218 Wis.2d 835, 578 N.W.2d 602 (1998). In Jackson, the Wisconsin court held that state's parental choice voucher program constitutional and interpreted the so-called "benefits clause" under article I, section 18 of the state's constitution, which provides that "nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries," as having meaning "equivalent of the Establishment Clause of the First Amendment." Id. at 620. In adopting an Establishment Clause standard, the Jackson court explained its reasoning, as follows:
[W]e focus our inquiry on whether the aid provided by the amended [voucher payment program] is "for the benefit of" such religious institutions.... [T]he language "for the benefit of" in art. I,  18 is not to be read as requiring that some shadow of incidental benefit to a church-related institution brings a state grant or contract to purchase within the prohibition of the section. Furthermore, ... the language of art. I  18 cannot be read as being so prohibitive as not to encompass the primary-effect test. The crucial question, under art. I,  18, as under the Establishment Clause, is not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion.
Id. at 621 (citations, footnotes and quotation marks omitted).
The Florida no-aid provision, however, is drafted to be substantially more restrictive than the "benefits clause" in the Wisconsin Constitution. First, the Wisconsin provision lacks a prohibition on both direct and indirect benefits. Second, the prohibition in the Wisconsin Constitution does not expressly bar benefit to all "sectarian institutions," as does Florida's no-aid provision. As a result, we find the Jackson case distinguishable and the analysis in Jackson unpersuasive.

*362 VI. The Unconstitutionality of the OSP Does Not Render Other State Programs Similarly Unconstitutional

The Governor and the Attorney General argue that holding the OSP unconstitutional will put at risk a great multitude of other programs and activities in which the state provides funds for health and social service programs that are operated by institutions affiliated with a church or religious group. Those appellants assert that these programs range from the use of church buildings as polling places during elections; to the use of institutions affiliated with a religion to provide social services, such as substance abuse transitional housing or assistance to victims of crime; to the use of healthcare facilities owned by religious groups by Medicaid recipients.
Our holding here does not reach such programs. Our holding is premised on the record before us and on the language, history and intent of Florida's no-aid provision, which was originally enacted, in no small part, to prohibit the state from using its revenue to benefit religious schools. Our holding in this case resolves the case before us and leaves for another day, if need be, a decision on the constitutionality of any other government program or activity which involves a religious or sectarian institution.
Further, the appellants' argument is pure speculation. There is nothing in this record on which the trial court or this court can reach any conclusions about the impact of the opinion in any programs other than the OSP ÔÇö a program which undisputedly involves the payment of state funds to religious schools. In the speculative impacts argued by these appellants, we have no way to determine whether state funds are paid to a religious institution or a non-profit, non-sectarian institution affiliated with a religion.
As we discuss above, nothing in the Florida no-aid provision would create a constitutional bar to state aid to a non-profit institution that was not itself sectarian, even if the institution is affiliated with a religious order or religious organization. Unlike the sectarian schools receiving OSP vouchers, it has been observed that the health and social service programs and activities raised in the appellants' arguments, although affiliated with a church or religion, are generally operated through non-profit organizations that are not sectarian or, at least, not pervasively sectarian institutions. See David Saperstein, Public Accountability and Faith Based Organizations: A Problem Best Avoided, 116 Harv. L.Rev. 1353, 1358-61 (2003); Jonathan Friedman, Note, Charitable Choice and the Establishment Clause, 5 Geo. J. on Fighting Poverty 103, 104 (1997); see, e.g., Bowen v. Kendrick, 487 U.S. 589, 610, 108 S.Ct. 2562, 2574-75, 101 L.Ed.2d 520 (1988)(the Adolescent Family Life Act did not violate the Establishment Clause because the law did not indicate that a "significant portion of the federal funds will be disbursed to pervasively sectarian institutions.").[17] The analysis of the application of the no-aid provision to other programs is for another time and another case involving its own unique facts.

VII. Florida's No-Aid Provision Does Not Violate the Free Exercise Clause

Appellants argue that, if the no-aid provision prohibits the use of state funds to provide OSP vouchers in religious schools, the no-aid provision would discriminate against recipients of vouchers who prefer to attend religious schools in *363 violation of the Free Exercise Clause of the First Amendment. In arguing that the application of the no-aid provision violates the Free Exercise clause, appellants rely upon the recent decision of the Ninth Circuit Court of Appeals in Davey v. Locke, 299 F.3d 748 (9th Cir.2002), reversed sub nom Locke v. Davey, 124 S.Ct. at 1307. In view of the recent decision of the United States Supreme Court reversing the judgment of the Ninth Circuit in Locke, we hold that Florida's no-aid provision does not violate the Free Exercise Clause.
In Locke, a college student challenged, as violative of the Free Exercise clause of the First Amendment, a Washington statute that denied a state-funded scholarship to qualified students solely because the student-recipient sought to pursue a degree in theology.[18] The Washington statute was consistent with the no-aid provision in the Washington Constitution. [19] The district court granted summary judgment in favor of the state. In reversing, the Ninth Circuit found that the statute lacked neutrality, implicated the free exercise interests articulated in Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), and required strict scrutiny review. Locke, 299 F.3d at 757-58. The Ninth Circuit held that the "policy denying [the scholarship] to a student otherwise qualified for it according to objective criteria solely because the student decides to pursue a degree in theology from a religious perspective infringes his right to the free exercise of his religion." Id. at 760. Although the court recognized Washington's "indisputably strong interest in not appropriating or applying money to religious instruction as mandated by its constitution," id. at 759, it found that the state's interest was not compelling. Id. at 760.[20]
In reversing, the Supreme Court held that the denial of funding for religious institutions pursuant to Article I, section 11 of the Washington Constitution was not violative of the Free Exercise Clause. Locke. The Court described the constitutional issue before it to be "whether Washington, *364 pursuant to its own constitution, which has been authoritatively interpreted as prohibiting even indirectly funding religious instruction that will prepare students for the ministry, can deny ... such funding without violating the Free Exercise Clause." Id., 124 S.Ct. at 1312 (citations and footnotes omitted).
The Court concluded that "there is no doubt that the State could, consistent with the Federal Constitution, permit Promise Scholars to pursue a degree in devotional theology," and that the Free Exercise Clause did not require the state to provide such funding. Id. In reaching its holding, the Court in Locke defined the interplay between the Establishment Clause and the Free Exercise Clause. As the Court explained:
the Establishment Clause and the Free Exercise Clause, are frequently in tension. See Norwood v. Harrison, 413 U.S. 455, 469, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973)(citing Tilton v. Richardson, 403 U.S. 672, 677, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971)). Yet we have long said that "there is room for play in the joints" between them. Walz v. Tax Comm'n of City of New York, 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). In other words, there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause.
This case involves that "play in the joints" described above.
124 S.Ct. at 1311.
After discussing the history of, and state interests involved in, state constitutional provisions such as those in the Washington and Florida Constitutions, the Supreme Court found
neither in the history or text of Article I,  11 of the Washington Constitution, nor in the operation of the Promise Scholarship Program, anything that suggests animus towards religion. Given the historic and substantial state interest at issue, we therefore cannot conclude that the denial of funding for vocational religious instruction alone is inherently constitutionally suspect.... The State's interest in not funding the pursuit of devotional degrees is substantial and the exclusion of such funding places a relatively minor burden on Promise Scholars. If any room exists between the two Religion Clauses, it must be here.
Id. at 1315 (footnote omitted).
Although in Locke the prohibitions in article I,  11 of the Washington Constitution on using "public money ... for ... the support of any religious establishment...." was applied to deny the use of state funds for the pursuit of a theology degree, nothing in the Locke opinion or the Washington Constitution limits its application to those facts. Just as in the provision of the Washington Constitution at issue in Locke, nothing in the history or text of the Florida no-aid provision suggests animus towards religion. Further, like the Washington provision in Locke, the Florida no-aid provision is an expression of a substantial state interest of prohibiting the use of tax funds "directly or indirectly" to aid religious institutions.
Indeed, the language of article I, section 11 of the Washington Constitution, precluding use of "public money or property" to be "appropriated for or applied to ... the support of any religious establishment," is so similar to the no-aid provision of the Florida Constitution that there can be no question that, since the Washington Constitution cannot violate the Free Exercise Clause of the Federal Constitution, the Florida Constitution does not violate the Free Exercise Clause. Locke, 124 S.Ct. at 1307. Thus, we hold that the application of the no-aid provision to deny *365 the use of OSP vouchers in religious schools fits within the "play in the joints" between the Establishment Clause and the Free Exercise Clause and, thus, does not violate the Free Exercise Clause of the United States Constitution.
The dissent argues that our opinion, as well as the trial court's decision, constitutes a violation of the federal Free Exercise Clause. The dissent further contends that our interpretation of the no-aid provision violates the Florida Free Exercise Clause. Respectfully, we believe the dissent's contentions are erroneous.
First, no party to this consolidated proceeding has argued below or on appeal that the trial court's interpretation of the no-aid provision violates the Florida Free Exercise Clause. Whether the application of a statute, or here the no-aid provision, is constitutional must be raised first at the trial level. Trushin v. State, 425 So.2d 1126, 1129-30 (Fla.1982); State v. Johnson, 616 So.2d 1, 3 (Fla.1993); Westerheide v. State, 831 So.2d 93, 105 (Fla.2002).
Second, Florida courts have generally interpreted Florida's Free Exercise Clause as coequal to the federal clause. Toca v. State, 834 So.2d 204, 208 (Fla. 2d DCA 2002). In addition, as noted, one court has suggested that the language in the Florida Free Exercise Clause "affords less absolute protection than that provided by the United States Constitution." Warner v. City of Boca Raton, 267 F.3d 1223, 1226 n. 3 (11th Cir.2001). The dissent has cited no authority supporting its assertion that Florida's Free Exercise Clause has "less play in its joints" than the Federal Clause.
Finally, because article I, section 3 includes the Establishment Clause, the Free Exercise Clause, and the no-aid provision, it seems clear that its drafters intended the three clauses to be read as a whole. It is well-established that constitutional provisions must be read in pari materia "to form [a] congruous whole so as not to render any language superfluous." Physicians Healthcare Plans, Inc. v. Pfeifler, 846 So.2d 1129, 1134 (Fla.2003), quoting Dep't of Envtl. Protection v. Millender, 666 So.2d 882, 886 (Fla.1996). If the no-aid provision fits within the room provided by the "play in the joints" between the Establishment Clause and Free Exercise Clause of the United States Constitution, Locke, 124 S.Ct. at 1311, surely it fits comfortably in article I, section 3 in the spaces between Florida's Establishment Clause and Free Exercise Clause.
The dissent contends that, as we interpret the no-aid provision, the provision is non-neutral to and constitutes animus toward religion by discriminating against religious organizations. The dissent's contention, in effect, adopts the reasoning of Justice Scalia's dissent in Locke which was expressly rejected by Locke's majority opinion.
Like the dissent here, in Locke Justice Scalia relied on the principle of "neutrality" and asserted that the Locke majority opinion sustains "a public benefit program that facially discriminates against religion," Locke, 124 S.Ct. at 1316 (Scalia, J., dissenting), and is irreconcilable with the Court's decision in Lukumi.[21] As he *366 viewed the Locke facts, the State of Washington offered a generally applicable benefit and "carved out a solitary course of study for exclusion: theology." Id. at 1316. Justice Scalia asserted: "Let there be no doubt: This case is about discrimination against a religious minority.... [T]hose whose belief in their religion is so strong that they dedicate their study and their lives to its ministry...." Id. at 1320. Thus, he argues that the Washington policy denied Davey equal treatment under the law. Id. at 1316. In summary, Justice Scalia submitted that:
When the State makes a public benefit generally available, that benefit becomes part of the baseline against which burdens on religion are measured; and when the State withholds that benefit from some individuals solely on the basis of religion, it violates the Free Exercise Clause no less than if it had imposed a special tax.
Id. at 1316.
The majority opinion in Locke expressly rejected Justice Scalia's reading of the Free Exercise Clause and Lukumi. The majority reasoned that "the State's disfavor of religion (if it can be called that)" was relatively "mild [ ]" in that it "impose[d] neither criminal or civil sanctions on any type of religious service or rite," did not "deny to ministers the right to participate in the political affairs of the community," and did not "require students to choose between their religious beliefs and receiving a government benefit." Id. at 1312-13. "The State has merely chosen not to fund a distinct category of education." Id. at 1313. The majority opinion rejected the dissent's assertion that "generally available benefits are part of the baseline against which burdens on religion are measured," concluding that the scholarships were generally available only as to "training for secular professions" and that training for religious professions and training for secular professions "are not fungible." Id. at 1313. The majority in Locke also expressly found that the state's action was consistent with its "antiestablishment interests," in avoiding the use of tax funds "to support the ministry." Id. at 1313, 1314.
Like Justice Scalia, the dissent here submits that, if the State of Florida does not provide state funds to religious schools, it will be discriminating against those institutions in violation of the Free Exercise Clause. Locke clearly rejects that reasoning, as do we.

VIII. Conclusion and Certified Question.
In summary, we affirm the final summary judgment on appeal and hold that section 229.0537, Florida Statutes (1999), violates the no-aid provision found in the last sentence of article I, section 3 of the Florida Constitution because the OSP uses state revenues to aid sectarian schools. We also hold that the no-aid provision does not violate the federal Free Exercise Clause.
As did the trial court, we recognize the salutary public policy supporting the OSP legislation to enhance the educational opportunity of children trapped in substandard schools. Nevertheless, courts do not have the authority to ignore the clear language *367 of the Constitution, even for a popular program with a worthy purpose. If Floridians wish to remove or lessen the restrictions of the no-aid provision, they can do so by constitutional amendment. See art. XI, Fla. Const.
Under the Florida Constitution, the Florida Supreme Court possesses the jurisdiction to review our decision here because we are declaring invalid a state statute. Art. V,  3(b)(1), Fla. Const. Additionally, the issue presented here is both one of first impression in Florida and of great public importance. Accordingly, using a "belt and suspenders" approach, pursuant to article V, section 3(b)(4) of the Florida Constitution, we certify the following question to the Florida Supreme Court:
Does the Florida Opportunity Scholarship Program, section 229.0537, Florida Statutes (1999), violate article I, section 3 of the Florida Constitution?
AFFIRMED; QUESTION CERTIFIED.
ERVIN, ALLEN, WEBSTER, DAVIS, BENTON, PADOVANO, and BROWNING, JJ., concur.
BENTON, J., concurs with an opinion in which ALLEN, DAVIS, PADOVANO, and BROWNING, JJ., concur.
WOLF, C.J., concurs in part and dissents in part with an opinion.
POLSTON, J., dissents with an opinion in which BARFIELD, KAHN, LEWIS, and HAWKES, JJ., concur.
BENTON, J., concurring.
This is the second appearance in this court of these cases, consolidated below and given Second Circuit Case No. CV 99-3370. On the prior appeal, Bush v. Holmes, 767 So.2d 668, 675 (Fla. 1st DCA 2000), a panel of this court reversed a circuit court judgment that had ruled:
Section 229.0537, Fla. Stat., insofar as it establishes a program through which the State pays tuition for certain students to attend private schools, is declared to be unconstitutional on its face under Article IX,  1 of the Florida Constitution.
Holmes v. Bush, No. CV 99-3370, 2000 WL 526364, at * 8 (Fla.Cir.Ct. Mar.14, 2000). Under the circuit court's initial judgment, whether or not a private school has any religious affiliation or mission is immaterial. The critical point, under the trial court's initial view, was that a private school is not a component of "a uniform ... system of free public schools." Art. IX,  1, Fla. Const.
The parties argued the question whether Article IX, section 1 rendered section 229.0537 unconstitutional on the prior appeal. While the point was not (redundantly) reargued on the present appeal (taken, after all, in the same case), this sensible efficiency does not preclude affirming today on grounds that take into account that using public moneys for private school tuition payments does not discharge the constitutionally imposed "paramount duty" to provide "by law for a uniform,... safe, secure, and high quality system of free public schools." Art. IX,  1, Fla. Const.
Even where a trial court has relied on another rationale altogether, an appeals court may affirm under the "tipsy coachman" doctrine, which requires appeals courts to affirm correct results on grounds other than those erroneously stated by the trial court. "The key to the application of this doctrine of appellate efficiency is that there must have been support for the alternative theory or principle of law in the record before the trial court." See Robertson v. State, 829 So.2d 901, 906-07 (Fla.2002). Here the Article IX, section 1 claim was initially the focus of litigation in the trial court, and a record deemed adequate *368 in the prior appeal was made in the proceedings below.
Although Article IX, section 1 also addresses "institutions of higher learning" (state universities) and "other public education programs that the needs of the people may require," which include junior college education, adult education, vocational education, and possibly exceptional student education, see generally Scavella v. Sch. Bd. of Dade County, 363 So.2d 1095, 1098-99 (Fla.1978), the portion of the provision pertinent here provides:
It is ... a paramount duty of the state to make adequate provision for education.... Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education....
Art. IX,  1, Fla. Const. By this stage of the proceedings, the challengers have eschewed reliance on Article IX, section 6 as an independent ground for invalidating the statute. But Article IX, section 1 should be read in light of Article IX, section 6, which provides:
State school fund. ÔÇö The income derived from the state school fund shall, and the principal of the fund may, be appropriated, but only to the support and maintenance of free public schools.
It is against this backdrop that the court is asked to declare that our constitution condones funding of private schools (whether or not sectarian) to compete with public schools, rather than devoting such school funding to improvement of the public schools. See Bush v. Holmes, 767 So.2d at 676 ("[I]n establishing the OSP, the Legislature recognized that some public schools may not perform at an acceptable level, [so] the Legislature attempted to improve those schools by raising expectations for and creating competition among schools.").
In the initial trial court judgment, Judge L. Ralph Smith, Jr., set out the rule of construction that he gleaned from Florida Supreme Court precedent as what should govern in construing Article IX, section 1 of the Florida Constitution, as follows:
The Florida Supreme Court has long held that "[w]hen a constitution directs how a thing shall be done, that is in effect a prohibition to its being done in any other way." State ex rel. Murphy v. Barnes, 24 Fla. 29, 32, 3 So. 433, 434 (1888). The Court has reaffirmed that canon of construction in any number of subsequent decisions, and its leading case on the subject explains as follows:
The principle is well established that, where the Constitution expressly provides the manner of doing a thing, it impliedly forbids its being done in a substantially different manner. Even though the Constitution does not in terms prohibit the doing of a thing in another manner, the fact that it has prescribed the manner in which the thing shall be done is itself a prohibition against a different manner of doing it. Therefore, when the Constitution prescribes the manner of doing an act, the manner prescribed is exclusive, and it is beyond the power of the Legislature to enact a statute that would defeat the purpose of the constitutional provision.

Weinberger v. Board of Public Instruction, 93 Fla. 470, 478-79, 112 So. 253, 256 (1927) (emphasis added; citations omitted). See also State ex rel. Church v. Yeats, 74 Fla. 509, 521-22, 77 So. 262, 263 (1917); State ex rel. Ellars v. Board of County Comm'rs, 147 Fla. 278, 282, 3 So.2d 360, 362 (1941); In re Investigation of a Circuit Judge, 93 So.2d 601, 606 (Fla.1957); In re Advisory Opinion of the Governor Civil Rights, 306 So.2d 520, 523 (Fla.1975); Sullivan v. Askew, 348 So.2d 312, 315 (Fla.1977).

*369 Article IX, section 1 directs that it is a "paramount duty of the state to make adequate provision for the education of all children residing within its borders." But the Constitution also prescribes how the State is to carry out this education mandate. The sentence that imposes on the State the duty to make "adequate provision" for the education of Florida children is followed immediately by the requirement ÔÇö which can only be read as an instruction on the manner in which the State is to fulfill that duty ÔÇö that such adequate provision "shall be made" through "a uniform, efficient, safe, secure, and high quality system of free public schools..." (emphasis added).
Holmes v. Bush, 2000 WL 526364, at *3. Under this view, "very nearly everything ... in a state constitution operates as a restriction on the legislature, for ... commands ... directed to ... government ... will operate to invalidate inconsistent legislation." Frank P. Grad, The State Constitution: Its Function and Form for Our Time, 54 Va. L.Rev. 928, 964-65 (1968).
Our supreme court has shown great flexibility in applying the law of the case doctrine, see Fla. Dep't of Transp. v. Juliano, 801 So.2d 101, 106 (Fla.2001) ("Moreover, even as to those issues actually decided, the law of the case doctrine is more flexible than res judicata in that it also provides that an appellate court has the power to reconsider and correct an erroneous ruling that has become the law of the case where a prior ruling would result in a `manifest injustice.'"), and has said:
This is the same suit and we have not lost jurisdiction thereof. Consequently, we have the power to correct any error which the Chancellor or we may have heretofore made in the progress of this litigation. There is no question of res adjudicata because this is the same, not a new and different, suit. However this Court, among others, has gone so far as to hold that it will not invoke the doctrine of res adjudicata if to do so would work injustice. The propriety of such ruling can not be questioned when one reflects upon the fact that the primary purpose for which our courts were created is to administer justice. In the case of Wallace v. Luxmoore, 156 Fla. 725, 24 So.2d 302, 304, we said:
"Stare decisis and res adjudicata are perfectly sound doctrines, approved by this court, but they are governed by well-settled principles and when factual situations arise that to apply them would defeat justice we will apply a different rule. Social and economic complexes must compel the extension of legal formulas and the approval of new precedents when shown to be necessary to administer justice. In a democracy the administration of justice is the primary concern of the State and when this cannot be done effectively by adhering to old precedents they should be modified or discarded. Blind adherence to them gets us nowhere."
A Court should have less hesitancy in changing "the law of the case" before losing jurisdiction than it would have in refusing to apply the doctrine of res adjudicata when all the requisites thereof are present. We may change "the law of the case" at any time before we lose jurisdiction of a cause and will never hesitate to do so if we become convinced, as we are in this instance, that our original pronouncement of the law was erroneous and such ruling resulted in manifest injustice. In such a situation a court of justice should never adopt a pertinacious attitude.
Beverly Beach Props., Inc. v. Nelson, 68 So.2d 604, 607-08 (Fla.1953). See also U.S. v. Robinson, 690 F.2d 869, 872 (11th *370 Cir.1982); Parker v. State, 873 So.2d 270, 278 (Fla.2004); State v. Owen, 696 So.2d 715, 720 (Fla.1997); Strazzulla v. Hendrick, 177 So.2d 1, 4-5 (Fla.1965); State v. LoChiatto, 381 So.2d 245, 247 (Fla. 4th DCA 1979).
Even assuming that, when the panel reversed on the first appeal, it established the law of the case for subsequent panels of this court, see State v. McBride, 848 So.2d 287, 289-90 (Fla.2003) (stating that the law of the case "doctrine requires that `questions of law actually decided on appeal must govern the case in the same court and the trial court, through all subsequent stages of the proceedings.' Florida Dep't of Transp. v. Juliano, 801 So.2d 101, 105 (Fla.2001) (emphasis added)"), the initial panel decision did not bind the en banc court, which did not decide anything on the first appeal.
In precisely analogous circumstances, at least three federal circuits have held that the en banc court is no more bound by the more remote panel decision than by the more recent panel decision.
The law of the case doctrine does not, as the Army suggests, prevent us from reconsidering the issues raised in Watkins I. See, e.g., Shimman v. International Union of Operating Engineers, Local 18, 744 F.2d 1226, 1229 n. 3 (6th Cir.1984) (en banc) ("The law of the case doctrine ... does not impair the power of an en banc court to overrule any panel decision."), cert. denied, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985); Van Gemert v. Boeing Co., 590 F.2d 433, 436-37 n. 9 (2d Cir.1978) (en banc) (law of the case doctrine cannot immunize panel decisions from review by the court en banc), aff'd, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); cf. United States v. Mills, 810 F.2d 907, 909 (9th Cir.1987) (stating that law of the case is a discretionary doctrine and declining to apply the doctrine), cert. denied, 484 U.S. 832, 108 S.Ct. 107, 98 L.Ed.2d 67 (1987).
Watkins v. U.S. Army, 875 F.2d 699, 704 n. 8 (9th Cir.1989). The law of the case doctrine does not preclude consideration of the rationale of the initial judgment declaring section 229.0537 unconstitutional.
"When called upon to decide matters of fundamental rights, Florida's state courts are bound under federalist principles to give primacy to our state Constitution and to give independent legal import to every phrase and clause contained therein." Traylor v. State, 596 So.2d 957, 962 (Fla.1992). "The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim."[22]Sterling v. Cupp, 290 Or. 611, 625 P.2d 123, 126 (1981). Surely Article IX, section 1 is among the "phrases and clauses" to which "independent legal import" should be given in the present case. Nor can it be immaterial that the only circumstances in which section 229.0537 (presupposing "failing" schools) operates are antithetical to and forbidden by Article IX, section 1 (requiring that a "high quality *371 system of free public schools" be provided).
In sum, Article IX, section 1 is an appropriate consideration in today's affirmance of the second judgment entered (by a second trial judge), again finding section 229.0537, Florida Statutes, unconstitutional, albeit on other grounds. See Holmes v. Bush, 2002 WL 1809079, at *3 (Fla.Cir.Ct. Aug.5, 2002) ("declar[ing] that Florida Statute  229.0537 is unconstitutional" because it "provides for revenue to be taken from the public treasury and disbursed indirectly in aid of sectarian institutions [and so] impermissi[b]ly violates Article I,  3 of the Florida Constitution" and "enjoin[ing]... implement[ation of] the Opportunity Scholarship Program for the 2002-2003 school year and thereafter").
ALLEN, DAVIS, PADOVANO, and BROWNING, JJ., concur.
WOLF, C.J., Concurring in part and Dissenting in part.
Both sides in this litigation urge us to decide this case based on a facial challenge to the constitutionality of the Opportunity Scholarship Program, section 229.0537, Florida Statutes (1999).[23] The parties also urge an all-or-nothing approach in determining the constitutionality of programs that allow public dollars to ultimately be paid to sectarian institutions. Appellees assert that any program that permits public funds to be utilized in sectarian institutions should be declared unconstitutional pursuant to article I, section 3, Florida Constitution. They take this position notwithstanding the purpose of the program, the extent of public funding, whether the level of funding substantially exceeds the cost of the public benefit, or the means by which the public dollars reach the sectarian institution.
Appellants assert that article I, section 3 of the Florida Constitution should be interpreted in accordance with the establishment clause of the United States Constitution and that any program that provides parents with a choice of whether to utilize vouchers in a sectarian institution is constitutional pursuant to the dictates of Zelman v. Simmons-Harris, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002).
The parties may have taken these inflexible positions for philosophical, political, or strategic reasons. These reasons are immaterial to this court and to consideration of this case. Because the positions taken by both parties are unsupported by prior case law and result in tortured interpretations of the Florida Constitution, I would decline to adopt the position of either party.
Instead, I would determine that
1) the trial court erred in holding that section 229.0537, Florida Statutes (1999), facially violated article I, section 3, of the Florida Constitution, the so-called "no aid" provision which mandates that "[n]o revenue of the state ... shall ever be taken from the public treasury directly or indirectly in aid ... of any sectarian institution";
2) where the Legislature has identified a valid non-sectarian purpose totally unrelated to the aid of religious institutions, any enforcement of the provisions of article I, section 3, should involve an as applied analysis of whether a specific expenditure actually involves aid to a sectarian institution or merely involves an acceptable method of providing necessary services; and
3) article I, section 3 of the Florida Constitution is both broader in its intent and more restrictive concerning the expenditure *372 of public funds than the First Amendment of the United States Constitution.
In addition, even if this court determines that the Opportunity Scholarship Program is unconstitutional as applied to sectarian institutions, as a matter of deference to the legislative intent expressed in section 229.0537(1), Florida Statutes (1999), "to provide enhanced opportunity for students in the state to gain the knowledge and skills necessary for post secondary education," I would strike only that portion of the program that allows funds to be provided for sectarian institutions.
The trial court's summary judgment determining the facial constitutionality of the Opportunity Scholarship Program is based on the following two undisputed facts:
1. Opportunity scholarships are funded from state revenue.
2. Some parents use the opportunity scholarships to educate their children at sectarian institutions.
The trial court's determination regarding whether state revenue is being utilized in aid of any sectarian institution pursuant to article I, section 3 specifically ignores all issues related to legislative purpose, extent of the funding, and the public benefit involved. The holding of the trial court determines that these factors are not relevant. The supreme court has properly rejected this all-or-nothing approach in City of Boca Raton v. Gidman, 440 So.2d 1277 (Fla.1983), a case that is remarkably similar to the instant case.
In Gidman, a municipal expenditure was challenged on the grounds that it violated section 7.87 of the Boca Raton City Charter, which was at least as restrictive, if not more restrictive, than article I, section 3 of the Florida Constitution concerning the expenditure of public funds. That section reads, "No city funds shall be expended in any manner whatsoever to accrue either directly or indirectly to the benefit of any religious, charitable, benevolent, civic or service organization." Id. at 1279. A municipal charter is the constitution of a city and effectively limits the legislative power of a city in the same manner the state constitution limits the power of the Legislature. See Gontz v. Cooper City, 228 So.2d 913 (Fla. 4th DCA 1970).[24] The supreme court, however, held that the City of Boca Raton's expenditure of public funds for a day care center run by a non-profit organization did not violate the charter provision. Gidman, 440 So.2d at 1282. The court rejected the argument that the city charter provision was a total bar to spending city funds at the charitable institution and determined in that particular situation that no violation had occurred:
The center has no power to expend these funds for any purpose other than childcare services for the Boca Raton community. The beneficiaries of the city's contributions are the disadvantaged children. Any "benefit" received by the charitable organization itself is insignificant and cannot support a reasonable argument that this is the quality or quantity of benefit intended to be proscribed.
Id. at 1281-1282.[25] The court further stated that it would be an unreasonable or *373 ridiculous conclusion to read the charter provision as a total prohibition against the city contracting for these types of services. Id. at 1281. Similarly, in Southside Estates Baptist Church v. Board of Trustees, School Tax District No. I, In and For Duval County, 115 So.2d 697 (Fla.1959), the court rejected an all-or-nothing approach as leading to an absurd result and determined that the court must look at the quantum of benefit received by the religious institution to determine whether the Florida Constitution has been violated.
As the court determined in Gidman, the appropriate analysis must address who is the real beneficiary on a case by case basis rather than reading the constitutional language as a total prohibition. Since it cannot be shown that in all cases where state funds reach sectarian institutions the constitution will be violated, the trial court erred in upholding the facial challenge. See Cashatt v. State, 873 So.2d 430 (Fla. 1st DCA 2004).[26]
In the majority opinion, Judge Van Nortwick accepts the total prohibition approach rejected by the supreme court in Gidman.[27] The majority opinion also upholds the remedy of the trial court which is to strike the entire statute rather than just limiting the statute's application to non-sectarian institutions. In order to avoid catastrophic and absurd results which would occur if this inflexible approach was applied to areas other than public schools, the majority is forced to argue that the opinion is limited to public school funding and article I, section 3 may not apply to other areas receiving public funding. As pointed out in Judge Polston's dissenting opinion, the language of the Florida Constitution itself does not support this interpretation.[28]
I also, however, cannot accept the all-or-nothing approach urged upon us by appellants and argued in Judge Polston's dissent. I concur fully with Judge Van Nortwick's analysis that the language in article 1, section 3, of the Florida Constitution, concerning the "no-aid" provision, must be interpreted as imposing greater restrictions on state aid to religious schools than does the Establishment Clause in the United States Constitution, which contains no specific language addressing the provision of such aid. See Burnsed v. Seaboard Coastline R.R. Co., 290 So.2d 13 (Fla.1974) *374 (noting construction of the constitution is favored which gives effect to every clause and part thereof). Thus, I would also determine that the mere fact that the vouchers are given to parents who have a choice whether to utilize them in sectarian or non-sectarian schools does not shield such expenditures from a case by case determination of its validity under article I, section 3.
It is always easiest to draw bright line rules. We should avoid this temptation in navigating the critical area between the constitutional concepts of free exercise and the establishment of religion. See Locke v. Davey, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004). A case by case analysis avoids having to make a choice between unfettered discretion to spend public dollars at sectarian institutions and prohibiting any public dollars from ever being expended at a sectarian institution without weighing the public benefit against any substantial benefit to the institution.
I believe the majority erred in striking the entire scholarship program. While the issue of severability was not raised by the parties, I feel we should address this issue in order to uphold the intent of the Legislature. As explained in Ray v. Mortham, 742 So.2d 1276 (Fla.1999), the judiciary has an inherent power and duty to uphold the constitutionality of legislation whenever possible.
Severability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions. This doctrine is derived from the respect of the judiciary for the separation of powers, and is designed to show great deference to the legislative prerogative to enact laws.
The severability analysis answers the question of whether the taint of an illegal provision has infected the entire enactment, requiring the whole unit to fail. Stated simply: The severability of a statutory provision is determined by its relation to the overall legislative intent of the statute of which it is a part, and whether the statute, less the invalid provisions, can still accomplish this intent.
Id. at 1280 (citations and quotations omitted).
The court is also not limited in its remedies for curing an unconstitutional provision simply because the legislation may or may not contain a severability clause.[29] The absence of a severability clause does not prevent the court from exercising its inherent power to preserve the constitutionality of an act by eliminating invalid clauses if it is possible to do so. See Cramp v. Bd. of Public Instruction of Orange County, 137 So.2d 828 (Fla.1962).
Cramp, the leading case on severability, provides the following four-part test:
The rule is well established that the unconstitutionality of a portion of a statute will not necessarily condemn the entire act. When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed one without the other and, (4) an act complete in *375 itself remains after the invalid provisions are stricken.
Id. at 830. See, e.g., Schmitt v. State, 590 So.2d 404, 414 - 415 (Fla.1991) (finding overbroad definition in statute prohibiting sexual performance by child was severable); Knealing v. Puleo, 675 So.2d 593 (Fla.1996) (finding provision of mediation statute permitting offer of settlement to be made at any time after mediator declares impasse was unconstitutional, but holding unconstitutional provision was severable from remainder of statute).
Applying the Cramp test we must first determine whether the phrase "may be sectarian or" can be separated from the remaining valid provisions of the statute. Without this phrase subsection 4 would read:
(4) Private school eligibility. ÔÇö To be eligible to participate in the Opportunity Scholarship Program, a private school must be a Florida private school, nonsectarian, and must [comply with subsections (a) through (k)].
Because the section can be read without the "may be sectarian or" language, it is severable.
Second, the legislative purpose expressed in the remaining provisions of the statute can still be accomplished without the phrase "may be sectarian or." The Legislature does not mention religion or parental choice for religious schools as a purpose of the program.
(1) Findings and intent. ÔÇö The purpose of this section is to provide enhanced opportunity for students in this state to gain the knowledge and skills necessary for postsecondary education, a technical education, or the world of work.... The Legislature shall make available opportunity scholarships in order to give parents and guardians the opportunity for their children to attend a public school that is performing satisfactorily or to attend an eligible private school when the parent or guardian chooses to apply the equivalent of the public education funds generated by his or her child to the cost of tuition in the eligible private school as provided in paragraph (6)(a). Eligibility of a private school shall include the control and accountability requirements that, coupled with the exercise of parental choice, are reasonably necessary to secure the educational public purpose, as delineated in subsection (4).
 229.0537, Fla. Stat. (1999).
Additional language in the statute clearly establishes the intent of the Legislature to provide funds to only those schools who select students on a "religious-neutral basis" and do not "compel any student attending the private school on an opportunity scholarship to profess a specific ideological belief, to pray, or to worship."  229.0537(4)(e) and (j), Fla. Stat. (1999).
As to parts three and four of the test enumerated in Cramp, based on the legislative purpose to aid students, it is likely that the Legislature would have pursued this statute without the objectionable part, and the remainder of the act is consistent with goals expressed by the Legislature.[30] Therefore, we should refrain from declaring the entire act to be unconstitutional.
As a matter of deference to the Legislature, if the act is ultimately determined to be facially unconstitutional, I would not strike the entire act but only limit its application.
*376 POLSTON, J., dissenting.
Appellants argue that the trial court erroneously ruled in its final summary judgment that the Florida Opportunity Scholarship Program, section 229.0537, Florida Statutes (1999), violates Article I,  3 of the Florida Constitution and is therefore unconstitutional. I agree with appellants that the Opportunity Scholarship Program is constitutional and would reverse.
This constitutional issue is reviewed de novo. See Enter. Leasing Co. S. Cent. v. Hughes, 833 So.2d 832, 834 (Fla. 1st DCA 2002). When a trial court has declared a state law unconstitutional, the appellate court must begin the review process with the presumption that the law is constitutional. See Dep't of Ins. v. Keys Title & Abstract Co., 741 So.2d 599, 601 (Fla. 1st DCA 1999). Significantly, the party challenging the law has the burden of showing beyond a reasonable doubt that the law is unconstitutional. See A.B.A. Indus., Inc. v. City of Pinellas Park, 366 So.2d 761, 763 (Fla.1979) (ruling that an act of the Legislature "will not be declared unconstitutional unless it is determined to be invalid beyond a reasonable doubt"); Bush v. Holmes, 767 So.2d 668, 673 (Fla. 1st DCA 2000) (ruling that "[w]hen a legislative enactment is challenged the court should be liberal in its interpretation; every doubt should be resolved in favor of the constitutionality of the law, and the law should not be held invalid unless clearly unconstitutional beyond a reasonable doubt," quoting Taylor v. Dorsey, 155 Fla. 305, 19 So.2d 876, 882 (1944)); Medina v. Gulf Coast Linen Servs., 825 So.2d 1018, 1020 (Fla. 1st DCA 2002) (same). Contrary to the majority's ruling, the program is not clearly unconstitutional beyond a reasonable doubt.
The majority opinion is seriously flawed because it (i) fails to distinguish controlling Florida Supreme Court precedent, (ii) erroneously rules that the choice by the parents and guardians of the children benefitting from the program has no effect on the analysis of Article I,  3, (iii) ignores the federal constitutional Establishment Clause analysis addressing indirect aid, thereby incorrectly ruling that the analysis of Article I  3 is different from the federal constitution, and (iv) discriminates against religion in violation of the United States and Florida Free Exercise Clauses.
I disagree with the majority because I am of the view that the Establishment Clause of the Florida Constitution, which includes the no-aid language in Article I,  3, as interpreted by the Florida Supreme Court, means the same as the Establishment Clause in the United States Constitution, as interpreted by the United States Supreme Court.
Therefore, I respectfully dissent.

I. SCHOOLS ARE NOT DIFFERENT UNDER ART. I,  3
Appellant Attorney General Robert A. Butterworth argued that a general application of the trial court's construction of Article I,  3, "would prohibit any religious institution from acting as a government service provider or participating in secular general welfare programs where there is only an incidental benefit to religion." There is no distinction between this Opportunity Scholarship Program and the state Medicaid program that funds religiously affiliated or operated health care institutions providing free or subsidized medical care (e.g., St. Mary's Hospital in West Palm Beach and Baptist Medical Center in Jacksonville). Other examples are legislative programs providing public funds to any public or private person or organization for preservation of historic structures, rent paid to churches for use of their facilities as polling places, and government subsidized pre-K or childcare programs *377 operated by churches or faith-based organizations.
The Attorney General identified various legislative programs, in addition to Opportunity Scholarships, that eligible persons may utilize at private educational institutions across Florida, including those that are religiously affiliated or operated: Florida Bright Futures Scholarship Program, John M. McKay Scholarships for Students with Disabilities Program, Florida Private Student Assistance Grant Program, William L. Boyd, IV, Florida Resident Access Grants, Florida Partnership for School Readiness, Florida Postsecondary Student Assistance Grant Program, Jose Marti Scholarship Challenge Grant Program, Mary McLeod Bethune Scholarship Program, Critical Teacher Shortage Student Loan Forgiveness Program, and the Minority Teacher Education Scholars Program. No fewer than 23 religiously affiliated or operated private four-year universities in Florida are eligible to receive Bright Futures scholarship funds.
According to the Attorney General, the legislature has programs that provide funds directly to religiously affiliated educational institutions, stating that "in 2002, the Historically Black College and University Library Improvement Program provide[d] $8,974,038 in direct aid for library development to three religiously affiliated or operated private colleges: Bethune-Cookman College, Edward Waters College, and Florida Memorial College."
The majority states that its holding is premised on the history and intent of Florida's no-aid provision, as originally enacted, to prohibit the state from using its revenue to benefit religious schools, and then cautions that the holding "should not in any way be read as a comment on the constitutionality of any other government program or activity which involves a religious or sectarian institution." In other words, the majority says that schools are different under Article I,  3. However, there is nothing in the language of Article I,  3 indicating that it applies only to schools.
Moreover, there is no constitutional history indicating that it was the original intent of the drafters that Article I,  3 apply only to schools. There is no record of the Florida 1885 Constitution Convention that adopted the relevant language. Because the constitutional history is completely silent on intent, the majority is correct in its characterization of the history of the no-aid provision as "unambiguous." It unambiguously provides no help in construing the language of Article I,  3. We should not assume intent without more than we have before us.
The majority discusses at length the anti-Catholic bigotry associated with the "development of Blaine-era no-aid provisions in state constitutions," but then simply concludes that there is nothing in the constitutional history to indicate a bigoted purpose. The majority is selectively picking and choosing from so-called history to avoid the appearance of giving effect to anti-Catholic bigoted language. I agree with the majority that the history of Florida's Constitution is silent regarding an anti-Catholic bigotry. But it is also silent on any other intended meaning, contrary to the majority's assertion.
The majority further errs by relying on the legislature's failure to adopt a proposed change to the Constitution as evidence of intent (relating to the 1968 Constitution). See Duer v. Moore, 765 So.2d 743, 745 (Fla. 1st DCA 2000) ("Nor do we rely in any way on the reported failure, in a subsequent legislative session, of an effort to amend section 944.275(4)(b) to require DOC to treat `indeterminate offense dates' as dates certain. See generally United States v. Mitchell, 39 F.3d 465, 469 *378 n. 6 (4th Cir.1994) (`Silence is an unreliable source of legislative intent.'); Fleeman v. Case, 342 So.2d 815, 817 (Fla.1976) (`We decline to divine legislative intent ... from one attempt to amend ... [even a] proposed law in one chamber of the Legislature [despite the proposed law's enactment that session].'); Ellsworth v. Ins. Co. of North America, 508 So.2d 395, 398 (Fla. 1st DCA 1987) (`the effect of the ... amendments is not determinative of legislative intent with respect to the [original enactment]'))." Therefore, the history of Florida's Constitution does not help in this court's legal analysis of Article I,  3.
The majority's caution that the holding "should not in any way be read as a comment on the constitutionality of any other government program or activity which involves a religious or sectarian institution," is only to ignore the problem. Why wouldn't the holding be applied to other programs? There is no meaningful difference. These other programs could be successfully challenged under the majority opinion. Attempting to distinguish the programs, the majority indicates that the social service programs and activities raised in appellants' arguments, "although operated by a church or religion, are generally operated through non-profit subsidiaries that are not sectarian, or, at least, not pervasively sectarian institutions." Even if accepted as true, I do not understand how exercising control through a subsidiary should make a difference. Would the majority rule differently if the sectarian institutions operating schools were to establish corporations that they wholly own or control, thereby escaping the reach of the no-aid language under this reasoning? Or, is it acceptable to be a little religious under the constitution, but not so much as to be pervasive? These form over substance arguments are not sound constitutional analysis.
Schools are not different. The constitutionality of this Opportunity Scholarship Program should be treated the same as other programs under Article I,  3. I agree with the majority's certified question to the Florida Supreme Court because this is a matter of great public importance to a significant number of programs.

II. BACKGROUND OF THE OPPORTUNITY SCHOLARSHIP PROGRAM
Recognizing that children should have an "opportunity to obtain a high-quality education in this state," in 1999, the Florida Legislature implemented the Opportunity Scholarship Program. Ch. 99-398, at 4273,  2 at 4275-80, Laws of Fla. The Legislature stated:
The purpose of this section is to provide enhanced opportunity for students in this state to gain the knowledge and skills necessary for postsecondary education, a technical education, or the world of work. The Legislature recognizes that the voters of the State of Florida, in the November 1998 general election, amended s. 1, Art. IX of the Florida Constitution so as to make education a paramount duty of the state. The Legislature finds that the State Constitution requires the state to provide the opportunity to obtain a high-quality education. The Legislature further finds that a student should not be compelled, against the wishes of the student's parent or guardian, to remain in a school found by the state to be failing for 2 years in a 4-year period. The Legislature shall make available opportunity scholarships in order to give parents and guardians the opportunity for their children to attend a public school that is performing satisfactorily or to attend an eligible private school when the parent or guardian chooses to apply the equivalent of the public education *379 funds generated by his or her child to the cost of tuition in the eligible private school as provided in paragraph (6)(a). Eligibility of a private school shall include the control and accountability requirements that, coupled with the exercise of parental choice, are reasonably necessary to secure the educational public purpose, as delineated in subsection (4).
Id. at 4275-76 (codified as  229.0537(1), Fla. Stat. (1999))[31] (emphasis added).
School districts with a failing school are required to notify the parent or guardian of the students enrolled in or assigned to the failing school and offer the parent or guardian an opportunity to enroll the student in public school within the district that is performing at an acceptable level. Id. at 4277 (codified as  229.0537(3)(a), Fla. Stat. (1999)). The school districts with a failing school must also notify the parent or guardian that he or she may choose to enroll the student in a higher-performing public school that has available space in an adjacent school district. Id. (codified as  229.0537(3)(b), Fla. Stat. (1999)). If a student has spent the prior year in a failing public school, the student's parent or guardian may request and receive from the state an Opportunity Scholarship for the child to enroll in and attend a private school, sectarian or nonsectarian. Id. at 4276-77 (codified as  229.0537(2) & (4), Fla. Stat. (1999)).
The private schools participating in the Opportunity Scholarship Program have specified requirements, including an agreement "not to compel any student attending the private school on an opportunity scholarship to profess a specific ideological belief, to pray, or to worship." Id. at 4278 (codified as  229.0537(4)(j), Fla. Stat. (1999)). For students attending private schools, payment "must be by individual warrant made payable to the student's parent or guardian and mailed by the Department of Education to the private school of the parent's or guardian's choice and the parent or guardian shall restrictively endorse the warrant to the private school." Id. at 4280 (codified as  229.0537(6)(b), Fla. Stat. (1999)).

III. ART. I,  3, FLA. CONST. PRECEDENT
Appellants argue that the trial court's final summary judgment must be reversed under controlling Florida precedent. I agree because the Florida Supreme Court has addressed and rejected similar challenges under Article I,  3 of the Florida Constitution.

Koerner v. Borck
In Koerner v. Borck, 100 So.2d 398, 401 (Fla.1958), the Florida Supreme Court considered the issue of whether Orange County, Florida, could "accept a devise of land for its use as a county park where the devise carries with it a perpetual easement to use the land and the lake adjacent thereto for baptismal purposes" consistent with the Establishment Clause of the First Amendment to the United States Constitution and Section 6 of the Declaration of Rights of the Florida Constitution.[32] The *380 Florida Supreme Court recognized that prohibiting baptisms in public waters would violate the United States Constitution because state power cannot be used to handicap religions any more than it can to favor them. Id. (citing Everson v. Bd. of Educ. of Ewing Township, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947)). The Florida Supreme Court also rejected the challenge under Section 6 of Florida's Constitution, stating:
Nor is the Chancellor's decree amenable to the attack here made under Section 6 of the Declaration of Rights of the Florida Constitution, F.S.A., prohibiting the expenditure of public funds, directly or indirectly, in aid of any church, sect, religious denomination, or sectarian institution. Here, as in Fenske v. Coddington, supra, 57 So.2d 452, any improvement to the county-owned land will be made for the benefit of the people of the county and not for the church. This contention cannot, therefore, be sustained.
Id. at 402 (emphasis added). The majority's characterization of this ruling by the Florida Supreme Court as dicta is wrong. The devise to the county was challenged under both the federal and state constitutions, and the Court ruled on both in its holding. Contrary to the majority's attempt to distinguish the case as not involving state revenues for a sectarian institution, the donated property was revenue to the county,[33] and its use for baptizing by members of the Downey Memorial Church was at issue.
In this case, the trial court recognized in the final summary judgment that the purpose of the statute is to "enhance the educational opportunity of children caught in the snare of substandard schools," which is consistent with the Legislature's stated purpose "to provide enhanced opportunity for students in this state to gain the knowledge and skills necessary for postsecondary education, a technical education, or the world of work." Ch. 99-398,  2 at 4275, Laws of Fla. (numbered as  229.0537(1), Fla. Stat. (1999)).
Although in Koerner the church was allowed to conduct its baptisms on public property, the Florida Supreme Court held that the benefit accrued to the people of the county rather than the church. Likewise in this case, although the sectarian schools have additional students in their classrooms if chosen by their parents or guardians, the program is intended to benefit those students who would otherwise not receive a quality education. Therefore, appellees' contention that the Court's ruling was dicta and distinguishable cannot be sustained.

Southside Estates Baptist Church v. Board of Trustees
Shortly after the Koerner decision, the Florida Supreme Court in Southside Estates addressed whether a Florida public school can be used temporarily as a place of worship during non-school hours. Southside Estates Baptist Church v. Bd. of Trs., 115 So.2d 697 (Fla.1959). In that case, the Board of Trustees, School Tax District No. 1, in and for Duval County, permitted several churches to temporarily use various school buildings during Sunday non-school hours pending construction of their church buildings. Id. at 698. The record did not show whether the churches *381 paid rent, nor did it reflect any direct expense to the school trustees. Id.
The appellants contended that the use of the school building was "an indirect contribution of financial assistance to a church in violation of Section 6 of the Declaration of Rights of the Florida Constitution," arguing that "regardless of how small the amount of money might be, nevertheless, if anything of value can be traced from the public agency to the religious group, the Constitution has been thereby violated." Id. at 698-99. The Florida Supreme Court rejected this argument, stating that "[n]othing of substantial consequence is shown and we see no reason to burden this opinion with a discussion of trivia." Id. at 699-700. "[A]n incidental benefit to a religious group resulting from an appropriate use of public property is not violative of Section 6, of the Declaration of Rights of the Florida Constitution." Id. at 700.
Analyzing appellant's argument that any benefit to a religious group resulting from the use of public property "ipso facto constitutes an indirect contribution of public funds in violation of the cited section of the Florida Declaration of Rights," the Florida Supreme Court recognized that such a rule would prohibit religious services in university stadiums and public parks. Id."We think that when the rule is reduced to such absurd application its fallacies and weaknesses become obvious." Id.
The trial court in the instant case erroneously held that any benefit to a religious group resulting from the program ipso facto constitutes an indirect contribution of public funds in violation of Florida's Constitution ÔÇö the same argument rejected by the Florida Supreme Court in Southside Estates. The majority's contention that Southside Estates is not on point is in error.

Johnson v. Presbyterian Homes of Synod of Florida, Inc.

In Johnson, the church-affiliated owner of a home for the aged brought actions against the city and county contesting assessment of real property taxes, arguing that the property was exempt from taxes pursuant to section 192.06(14), Florida Statutes (1967). Johnson v. Presbyterian Homes of Synod of Fla., Inc., 239 So.2d 256, 258 (Fla.1970). The defendants contended that the exemption statute was unconstitutional as applied to the facts of the case in that it attempted to grant tax exemptions to homes for the aged owned by religious organizations and operated primarily for religious purposes. Id.
The Florida Supreme Court noted that the "atmosphere of the home is religious" and the "spiritual needs of the residents are provided for" with "`Christian care' with Bible instruction and study." Id. The defendants argued that the statutory tax exemption violated Section 6 of the Florida Constitution and the Establishment Clause of the United States Constitution. Id. at 258-59. The Florida Supreme Court stated:
It is apparent that Fla. Stat. (1967), s 192.06(14), F.S.A., was enacted to promote the general welfare through encouraging the establishment of homes for the aged and not to favor religion, since it is not limited to homes for the aged maintained by religious groups, but applies to any which are owned and operated in compliance with the terms of the statute by Florida corporations not for profit. Under the circumstances, any benefit received by religious denominations is merely incidental to the achievement of a public purpose.

...

A state cannot pass a law to aid one religion or all religions, but state action to promote the general welfare of society, *382 apart from any religious considerations, is valid, even though religious interests may be indirectly benefitted.

Id. at 261 (emphasis added).
The Florida Supreme Court recognized that the tax exemption was not only available to homes for the aged owned by religious organizations, but also to any bona fide homes for the aged that were duly licensed, owned, and operated in compliance with the terms of the statute by Florida not-for-profit corporations. Id."To exempt all homes complying with the statute, except church-related homes, would indeed be discriminatory and inconsistent with the obvious intent and secular aims of the Legislature. The fact that the home for the aged may be owned by a religious denomination does not exclude the benefits of Fla. Stat. (1967)  192.06(14), F.S.A." Id. at 262.
The scholarship program permits the parents or guardians to choose not only private sectarian schools, but also any qualifying public or private non-sectarian schools. "To exempt all [schools] complying with the statute, except church-related [schools], would indeed be discriminatory and inconsistent with the obvious intent and secular aims of the Legislature." Id. (emphasis added). As in Johnson, the fact that the private schools may be owned by a religious denomination does not exclude the benefits of the program for the children to obtain a quality education. The Florida Legislature acted to promote the general welfare of society by enacting the program apart from any religious considerations. Therefore, the program is valid, even though religious interests may be indirectly benefitted. Id. at 261.
The majority attempts to distinguish the instant case from Johnson because the statute in Johnson involves a tax exemption rather than a disbursement. The distinction between a benefit arising from a tax exemption and a payment from the state is one without a difference. For example, a taxpayer may get the same bottom-line benefit on an income tax return whether it is in the form of a tax exemption excluding income from the definition of gross income, whether it is an allowable deduction, a reduction in the rate of tax percentage computed on taxable income, a tax credit, or simply a payment from the government to the individual. In short, it does not matter what you call it if the resulting benefit is the same (otherwise, it is form over substance).[34] Would the majority find a statute that provided a tax exemption only to religious organizations, but not other charitable organizations, constitutional under the no-aid language of the constitution or treat it the same as if there was a direct payment from the state?[35] The treatment should *383 be the same and the Opportunity Scholarship Program held constitutional under Johnson.

Nohrr v. Brevard County Educational Facilities Authority
In Nohrr, the plaintiffs challenged the constitutionality of the Higher Educational Facilities Authorities Law, arguing that it permits the authorities to issue revenue bonds in order to aid religious schools, as well as secular schools, thereby violating the Establishment Clause of the United States Constitution and Article I,  3 of the Florida Constitution. Nohrr v. Brevard County Educ. Facilities Auth., 247 So.2d 304, 307 (Fla.1971). Stating that the law was enacted to promote the general welfare by "enabling institutions of higher education to provide facilities and structures sorely needed for the development of the intellectual and mental capacity of our youth," and citing Johnson and Walz, the Florida Supreme Court held that the law did not violate the United States and Florida Constitutions. Id.
As in Nohrr, appellees argue, and the trial court held, that because the legislation will benefit religious schools, as well as secular schools, it violates Article I,  3 of the Florida Constitution. The Florida Supreme Court rejected this argument in Nohrr, stating that the law promoted the general welfare by developing our youth. Id. at 307 ("A state cannot pass a law to aid one religion or all religions, but state action to promote the general welfare of society, apart from any religious considerations, is valid, even though religious interests may be indirectly benefited."). Similarly, although religious schools may obtain additional students, this Opportunity Scholarship Program was enacted to promote the general welfare by providing quality educational opportunities for children and does not violate Article I,  3 of the Florida Constitution.

City of Boca Raton v. Gidman
In City of Boca Raton, Boca Raton contracted with the Florida Department of Health and Rehabilitative Services to contribute matching state and federal funds to the Florence Fuller Child Development Center, a non-profit, educational child care center in Boca Raton. City of Boca Raton v. Gidman, 440 So.2d 1277, 1278 (Fla.1983). The center provided "subsidized child care services including infant nursery care, pre-school and after school programs and summer programs for disadvantaged children." Id. The respondents brought suit against Boca Raton to enjoin its contribution to the center on the basis that it violated Section 7.07 of the city's charter, stating: "No city funds shall be expended in any manner whatsoever to accrue either directly or indirectly to the benefit of any religious, charitable, benevolent, civic or service organization." Id. at 1279 (emphasis added).
The Florida Supreme Court held that the money paid by Boca Raton for the operation of a non-profit child care center benefitted disadvantaged children rather than the receiving charitable organization, rejecting the contention that this expenditure was prohibited by the city's charter. Id. at 1282. The same analysis should be applied to this case. The Opportunity Scholarship Program benefits children disadvantaged *384 by failing schools rather than the receiving religious organization.

IV. CONSTITUTIONAL BECAUSE PARENTS HAVE A CHOICE
Appellees admit that the challenged program does not violate the United States Constitution because of the United States Supreme Court's recent ruling in Zelman v. Simmons-Harris, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002). Zelman was decided while appellees' underlying case was pending and resulted in their voluntary dismissal of their federal constitutional challenge. In Zelman, the Court held that a very similar Ohio program designed to give educational choices to families with children in failing schools did not violate the Establishment Clause of the United States Constitution. 536 U.S. at 643-44, 122 S.Ct. 2460. Private schools, including religious schools, could participate in the program, along with adjacent public schools. Id. Exactly the same as in Florida, "[i]f parents choose a private school, checks are made payable to the parents who then endorse the checks over to the chosen school." Id. at 646, 122 S.Ct. 2460.
Addressing whether the Ohio program has the forbidden effect under the Establishment Clause of advancing or inhibiting religion, the Court stated:
[O]ur decisions have drawn a consistent distinction between government programs that provide aid directly to religious schools [citations omitted], and programs of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals, Mueller v. Allen, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983); Witters v. Washington Dept. of Servs. for Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986); Zobrest v. Catalina Foothills School Dist., 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993). While our jurisprudence with respect to the constitutionality of direct aid programs has "changed significantly" over the past two decades, Agostini, supra, at 236, 117 S.Ct. 1997, our jurisprudence with respect to true private choice programs has remained consistent and unbroken. Three times we have confronted Establishment Clause challenges to neutral government programs that provide aid directly to a broad class of individuals who, in turn, direct the aid to religious schools or institutions of their own choosing. Three times we have rejected such challenges [citing Mueller, Witters, and Zobrest].
...

Mueller, Witters, and Zobrest thus make clear that where a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause. A program that shares these features permits government aid to reach religious institutions only by way of the deliberate choices of numerous individual recipients. The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits.
Id. at 649-52, 122 S.Ct. 2460. The Court then held that the challenged Ohio program is a program of true private choice and, therefore, constitutional. Id. at 653, 122 S.Ct. 2460. The focus is on "neutrality and the principle of private choice, not on *385 the number of program beneficiaries attending religious schools." Id. at 652, 122 S.Ct. 2460. This analysis for the federal Establishment Clause is the same as discussed earlier by the various cases decided by the Florida Supreme Court for Article I,  3.
There are no meaningful differences between the Ohio program and Florida's program. Appellees state that Florida's program does not violate the United States Constitution, and accordingly dismissed their related claim after Zelman was decided. It follows that, in accordance with Zelman, Florida's program is neutral and provides parents and guardians a true private choice. The program provides parents and guardians access to public and private schools, sectarian and non-sectarian. Therefore, the program is neutral to religion. The program also explicitly provides parents and guardians the choice to let their children stay in their current school, attend other public schools in the same or adjoining school districts, or attend private schools, sectarian or non-sectarian. As in Zelman, the challenged Florida program is a program of true private choice and, therefore, constitutional.
For students attending private schools, payment "must be by individual warrant made payable to the student's parent or guardian and mailed by the Department of Education to the private school of the parent's or guardian's choice and the parent or guardian shall restrictively endorse the warrant to the private school." Ch. 99-398,  2 at 4280, Laws of Fla. The trial court, citing a 1979 case from Alaska,[36] erroneously held that this provision amounts to a "colossal triumph of form over substance," and causes the program to violate Article I,  3 of the Florida Constitution.
This same restrictive endorsement mechanism provision found unconstitutional by the trial court was found to provide a true choice and held constitutional by the United States Supreme Court in Zelman. 536 U.S. at 653, 122 S.Ct. 2460; see also Jackson v. Benson, 218 Wis.2d 835, 578 N.W.2d 602, 609, 620-23 (1998) (holding a school choice program constitutional under federal and state constitutions with the same restrictive endorsement mechanism). The trial court's ruling erroneously ignores the program's numerous provisions giving parents and guardians the choice of where their children go to school. The parents or guardians make their choice before the warrants are issued, not by their restrictive endorsements. The restrictive endorsement procedure simply describes the mechanics of implementing the choice already made.
Because parents and guardians have a choice, their children, who would otherwise attend failing schools, rather than sectarian institutions, are aided by the program. Accordingly, the program does not violate Article I,  3 of the Florida Constitution. The majority completely fails to address the effect of choice in the analysis.

V. ART. I,  3, FLA. CONST. IS NOT MORE RESTRICTIVE
The majority holds, citing Silver Rose Entm't, Inc. v. Clay County, 646 So.2d 246, 250-51 (Fla. 1st DCA 1994), that although the program is constitutional under the United States Constitution, the program violates Article I,  3 of the Florida Constitution because the last sentence of Florida's Constitution against indirect aid *386 is more restrictive than the United States Constitution. In Silver Rose, the court stated that, to satisfy Article I,  3 of the Florida Constitution, the three-prong test under Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), must be satisfied and that the no-aid language of section 3 "adds a fourth" prong.[37] However, the court held that Clay County's ordinance outlawing the sale of alcohol on "Christmas day and Christmas night" was not facially unconstitutional. Id. at 253. Because the no-aid language in the last sentence of Article I,  3 was not at issue in the case, the "fourth prong" statement in Silver Rose is dicta. The court simply compared the explicit language of the constitutions, but made no comparison of the holdings by the Florida Supreme Court and the United States Supreme Court construing the relevant language of the constitutions. While the court in Silver Rose had no reason to do such an analysis, this case requires it, but the majority has failed to engage in the analysis. Rather, the majority has blindly accepted the appellees' argument that the Florida no-aid provision differs from the United States Constitution. In doing so, the majority has erred.
For us to hold that the no-aid language in the last sentence of Article I,  3 adds restrictions to the Florida Constitution not found in the United States Constitution, as appellees argue, we would have to determine that there are no similar no-aid restrictions in the United States Constitution. To the contrary, even though the same explicit words in the Florida Constitution are not stated in the Establishment Clause of the United States Constitution, the United States Supreme Court's interpretations of the Establishment Clause require the same analysis for indirect aid. The Court has specifically addressed aid to schools, direct and indirect, in the context of the Establishment Clause. See Zelman, 536 U.S. at 648-53, 122 S.Ct. 2460 (collecting cases). In Zelman, Justice O'Connor describes the analysis:
The test today is basically the same as that set forth in School Dist. of Abington Township v. Schempp, 374 U.S. 203, 222, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)(citing Everson v. Board of Ed. of Ewing, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); McGowan v. Maryland, 366 U.S. 420, 442, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)), over 40 years ago.
The Court's opinion in these cases focuses on a narrow question related to the Lemon test: how to apply the primary effects prong in indirect aid cases? Specifically, it clarifies the basic inquiry when trying to determine whether a program that distributes aid to beneficiaries, rather than directly to service providers, has the primary effect of advancing or inhibiting religion, Lemon v. Kurtzman, supra, at 613-614, 91 S.Ct. 2105, or, as I have put it, of "endors [ing] or disapprov[ing] ... religion," Lynch v. Donnelly, supra, at 691-692, 104 S.Ct. 1355, 79 L.Ed.2d 604 (concurring opinion); see also Wallace v. Jaffree, 472 U.S. 38, 69-70, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)(O'CONNOR, J., concurring in judgment). See also ante, at 2467. Courts are instructed to consider two factors: first, whether the program administers aid in a neutral *387 fashion, without differentiation based on the religious status of beneficiaries or providers of services; second, and more importantly, whether beneficiaries of indirect aid have a genuine choice among religious and nonreligious organizations when determining the organization to which they will direct that aid. If the answer to either query is "no," the program should be struck down under the Establishment Clause.

536 U.S. at 668-69, 122 S.Ct. 2460 (O'Connor, J., concurring) (emphasis added); See also Everson v. Bd. of Educ., 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (holding that state program reimbursing parents for expenses incurred in transporting their children to school, including religious schools, is constitutional); Bd. of Educ. of Cent. Sch. Dist. No. 1 v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (holding that state program loaning secular textbooks to all children within the state, including to those in religious schools, is constitutional). The various state cases cited by the majority involve different constitutional and statutory language not at issue here.
The majority ignores all of the United States Supreme Court decisions that analyze the federal Establishment Clause in terms of indirect aid to religious institutions. Florida's Constitution is not more restrictive ÔÇö indirect aid cases are analyzed under the federal Establishment Clause as well.[38] Because the Florida no-aid provision is no more restrictive than the United States provision, the Florida program should be ruled constitutional as was the program in Zelman.

VI. THE MAJORITY'S RULING DISCRIMINATES AGAINST RELIGION IN VIOLATION OF THE FEDERAL FREE EXERCISE CLAUSE
Appellants, on motion for rehearing and/or rehearing en banc, argue that the majority's ruling discriminates against religion in violation of the United States Free Exercise Clause, notwithstanding Locke v. Davey, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004). I agree.

Locke v. Davey
The United States Supreme Court, in Locke, ruled that a Washington statute prohibiting the use of state scholarship money for pursuing a degree in theology does not violate the United States Free Exercise Clause. Id. at 1309. The Court stated that the Establishment Clause and the Free Exercise Clause "are frequently in tension," and that "`there is room for play in the joints' between them. Walz v. Tax Comm'n of City of New York, 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)." Id. at 1311. The Court held that the statute fit within the "play between the joints." Id.
The majority's ruling is outside the play between the joints in violation of the United States Free Exercise Clause. Although a state may take action within this narrow "play between the joints" without violating the Free Exercise Clause, a state is not free to do whatever it may wish. Citizens in other states should not have greater *388 federal constitutional rights than citizens of Florida because of the erroneous trial court and majority decisions. The United States Free Exercise Clause still exists and protects against religious discrimination. In Walz, the Court stated:
The course of constitutional neutrality in this area [between the Establishment clause and Free Exercise Clause] cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.

397 U.S. at 669, 90 S.Ct. 1409 (emphasis added). State action may be permitted within the space of "play in the joints" when it is "productive of a benevolent neutrality," according to Walz. The Opportunity Scholarship Program, not the majority's adverse ruling, is a product of benevolent neutrality. Accordingly, the majority's ruling does not fit within the play between the joints as described by the Court.
In Locke, the Court specifically stated that the state's power is not without limit and noted that its holding only pertained to paying for the training of clergy:

Justice Scalia notes that the State's "philosophical preference" to protect individual conscience is potentially without limit, see post, at 1318; however, the only interest at issue here is the State's interest in not funding the religious training of clergy. Nothing in our opinion suggests that the State may justify any interest that its "philosophical preference" commands.
124 S.Ct. at 1313 n. 5 (emphasis added). The Court noted that "religious instruction is of a different ilk." Id. at 1314. Here, the majority's ruling is not a narrow prohibition against paying for the training of clergy. Therefore, Locke is distinguishable. The majority fails to address the limitations the Locke majority imposed on its ruling, avoiding discussion on the merits by summarily treating my analysis the same as Justice Scalia's rejected dissenting view. The majority erroneously treats Locke as a license for states to draw the United States Constitutional boundaries for the Free Exercise Clause, thereby giving the Clause no effect. Contrary to the majority's view, the "play between the joints" concept is not without limit, and not all state action will be permitted as falling within that narrow window.
The Locke Court emphasized that the exclusion of funding was a "relatively minor burden." Id. at 1315. That is not the case at bar. The effect of the majority's ruling is exceptionally significant to the Opportunity Scholarship Program and to the various state programs that are much larger in scope. Attorney General Robert A. Butterworth's argument that an application of the trial court's order would negatively impact a number of programs is correct. For example, pursuant to the majority opinion, the Bright Futures scholarship program may be declared unconstitutional in its entirety along with programs that fund hospitals because some of the program dollars are deposited into religious organizations. This would have a dramatic, devastating effect on colleges, students and their families, health care providers, and patients throughout Florida. See Polston, J. dissenting supra at "I. *389 Schools Are Not Different Under Art. I,  3" (listing various programs to be affected by this ruling as identified by Attorney General Butterworth).
The majority's ruling prohibits any money originating from the state to be paid to a religious organization, regardless of an individual's intervening choice and regardless of the reason. As appellants stated, "[r]arely has a decision been reached by this Court that would have such significant impact upon such a wide range of Florida citizens." This is not the same as the narrowly written Washington statute that fits within the narrow "play between the joints" as addressed in Locke. Rather, the majority is trying to fit its ruling, the size of a semi-truck, through the small window of the "play between the joints." There is no room between the joints for the majority's broad-sweeping interpretation of Florida's Constitution. The effect is too large ÔÇö there is not enough play.
The Court also noted in Locke that there was nothing in Washington's statute or constitution to suggest "animus towards religion." Id. at 1315. Here, the majority's interpretation of Article I,  3, constitutes animus toward religion because the effect is to discriminate against religious organizations. Religious organizations may, pursuant to the majority's interpretation of Florida's Constitution, be specifically excluded from various programs and from receiving tax exemptions currently enjoyed by religious organizations throughout Florida (e.g., property taxes and sales taxes) even though received through statutes that are broadly written and neutrally applied. Locke does not provide a safe haven to the majority's ruling beyond the reach of the Free Exercise Clause.

United States Free Exercise Clause
Because a constitutional provision should not be construed in a manner to render it inoperative, see Chiles v. Phelps, 714 So.2d 453, 459 (Fla.1998), I believe the trial court's and the majority's interpretation is in error. See Capital City Country Club, Inc. v. Tucker, 613 So.2d 448, 452 (Fla.1993) ("If it is reasonably possible to do so, we are obligated to interpret statutes in such a manner as to uphold their constitutionality."); State v. Gale Distribs., Inc., 349 So.2d 150, 153 (Fla.1977) ("[The courts] ha[ve] a duty, if reasonably possible and consistent with constitutional rights, to resolve all doubts as to the validity of a statute in favor of its constitutionality and to construe it so as not to conflict with the Constitution."). Even if the trial court's interpretation properly construed Article I,  3, such a construction would violate the United States Free Exercise Clause, requiring our reversal and vacation of the judgment. See U.S. Const. art. VI, cl. 2 (Supremacy Clause).
The trial court's interpretation of Article I,  3 violates the United States Constitution because it excludes religious organizations from participation. See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (holding that a city ordinance was not neutral and restricted religious practice, and therefore was an unconstitutional violation of free exercise); McDaniel v. Paty, 435 U.S. 618, 620, 629, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (holding that a provision in Tennessee's Constitution barring "Minister[s] of the Gospel, or priest[s] of any denomination whatever" from serving as a delegate to a Tennessee constitutional convention violated appellant's free exercise of religion under the United States Constitution); Good News Club v. Milford Cent. Sch., 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (holding that a school's exclusion of Christian children's club from meeting after hours at school based on its religious nature *390 was unconstitutional); Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (holding that the university's denial of funding to university student organization which published newspaper with Christian editorial viewpoint was unconstitutional); Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (holding that the university's closure of its facilities to a registered student group desiring to use the facilities for religious worship and religious discussion was unconstitutional; Missouri's interest in achieving greater separation of church and state under its own constitution was not sufficiently compelling to justify discrimination against religious free exercise and free speech protection under the United States Constitution).
The Establishment Clause, the Free Exercise Clause, and the Equal Protection Clause of the United States Constitution act in concert to prohibit state action that restricts, limits, or divests one's legal rights, duties, or benefits based on his or her religion. See Bd. of Educ. v. Grumet, 512 U.S. 687, 715, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (O'Connor, J., concurring). Just as the government may not discriminate based upon race, so too it may not discriminate based upon religion. Id. at 728, 114 S.Ct. 2481 (Kennedy, J., concurring). The Free Exercise Clause requires neutrality and prohibits "[o]fficial action that targets religious conduct for distinctive treatment." See Lukumi Babalu, 508 U.S. at 534, 113 S.Ct. 2217. The Equal Protection provision of the Fourteenth Amendment prohibits "an unlawful intent to discriminate against [individuals] for an invalid reason, such as their religion." Altman v. Minn. Dept. of Corr., 251 F.3d 1199, 1203 n. 3 (8th Cir.2001) (quoting in part Batra v. Bd. of Regents, 79 F.3d 717, 721 (8th Cir.1996)). The Free Exercise Clause pertains if the state action at issue "discriminates against some or all religious beliefs." Lukumi Babalu, 508 U.S. at 532, 113 S.Ct. 2217. The Equal Protection Clause provides protection analogous to the Free Exercise Clause against state action that targets individuals because of their religion. Id. at 540, 113 S.Ct. 2217. If the state action is neutral towards religion, there is no violation of the Free Exercise Clause and the Equal Protection Clause, even if the state action has an incidental effect of burdening religion. Id. at 531, 113 S.Ct. 2217. If the state action is not neutral towards religion, the state action must be justified by a compelling interest and be narrowly tailored. Id. at 531-32, 113 S.Ct. 2217. Together, the Free Exercise Clause and the Equal Protection Clause reinforce one another and prohibit state action that singles out religion for discriminatory treatment. The trial court violated these provisions by striking down the entire Opportunity Scholarship Program because the program allowed revenue from the public treasury to reach religious institutions.
Appellees argue that because the trial court struck down the entire program, and not just the portion involving scholarships for schooling at religious institutions, the trial court's order was neutral towards religion.[39] However, the Free Exercise *391 clause prohibits even "subtle departures from neutrality." Id. at 534, 113 S.Ct. 2217. "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." Id. The record in the instant case makes it clear that preventing the use of opportunity scholarships at religious institutions was the object of the trial court's order. Therefore, the trial court's order was not neutral towards religion, and it must be invalidated unless it was justified by a compelling governmental interest and narrowly tailored to advance that interest. Id. at 531-32, 113 S.Ct. 2217; see also Mo. Knights of the Ku Klux Klan v. Kansas City, 723 F.Supp. 1347, 1352 (W.D.Mo.1989) (ruling that whether the unconstitutional exclusion is accomplished individually or by elimination of the total forum is inconsequential, the result is the same); Britton v. City of Erie, 933 F.Supp. 1261, 1267 (W.D.Pa.1995) (ruling that eliminating a city public access channel would violate the equal protection clause if there was proof of a discriminatory intent or purpose).
Appellees argue that the trial court's order was justified by the compelling interest of complying with and enforcing the Florida Constitution's Establishment clause. This argument was raised in Widmar, 454 U.S. at 270, 102 S.Ct. 269. In Widmar, the Court stated, "[T]he state interest asserted here ÔÇö in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution ÔÇö is limited by the Free Exercise Clause." Id. at 276, 102 S.Ct. 269. In that case, the Court found that the state's interest was not sufficiently compelling to justify the discrimination in that case against religious speech. Id. at 276, 102 S.Ct. 269. Similarly, in the instant case, this Court should not recognize any state constitutional interest as sufficiently compelling to justify the discrimination against religion in violation of the Free Exercise Clause. Therefore, even if the trial court's judgment properly interpreted Article I,  3, it must be invalidated as unconstitutional because it targets religious conduct for distinctive treatment that is not justified by a compelling interest.[40]

*392 VII. THE MAJORITY'S RULING DISCRIMINATES AGAINST RELIGION IN VIOLATION OF FLORIDA'S FREE EXERCISE CLAUSE

The trial court, and the majority, simply rule that Florida's Establishment Clause, including the no-aid language, must be afforded great weight, without making any attempt to reconcile it with Florida's Free Exercise Clause. See Local Union No. 519 v. Robertson, 44 So.2d 899, 903 (Fla.1950) (ruling that when constitutional interests are competing, they should be harmonized to give effect to each). The trial court's interpretation of the no-aid language in the last sentence of Article I,  3 erroneously conflicts with the Free Exercise Clause of the Florida Constitution. See Chiles, 714 So.2d at 459 (Fla.1998) (ruling that the Florida Constitution should not be read in a conflicting manner); Capital City Country Club, 613 So.2d at 452.
Ignoring the Free Exercise Clause of Florida's Constitution in the first sentence of Article I,  3, the trial court stated that the only portion of Article I,  3 that had any relevance to the proceeding was the last sentence.[41] The first sentence states: "There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof." The phrase "or penalizing" is not explicitly stated in the United States Constitution's Free Exercise Clause. To the extent that appellees argue that the additional no-aid language in Florida's Establishment Clause should be read as more restrictive, this additional language in the Free Exercise Clause should also be read as more restrictive. Instead of applying the same legal reasoning to both the Establishment Clause and Free Exercise Clause, the majority ignores this different language and states, without any analysis, that Florida's Free Exercise Clause means the same as the United States Constitution.
A plain reading of the phrase "or penalizing" precludes discriminatory actions against religious organizations. See Merriam-Webster's Collegiate Dictionary 858 (10th ed.1998) (defining "penalize" as "to put at a serious disadvantage"). Under the majority's legal reasoning that more words in the Florida Constitution necessarily means more restrictions, it follows that there is less "play in the joints" between the Florida Establishment Clause and the Florida Free Exercise Clause than between these clauses in the United States Constitution.[42] If there is less "play in the joints" in the Florida Constitution, then there is less room for the disparate treatment of religious organizations under the Florida Constitution. Therefore, the trial *393 court's discriminatory ruling is contrary to Florida's Free Exercise Clause.
With less play in the joints than in the Federal Constitution, the United States Supreme Court decisions prohibiting discrimination against religion, not applied in Locke, should be followed as persuasive authority in interpreting Florida's Free Exercise Clause. See Polston, J. dissenting supra at "VI. The Majority's Ruling Discriminates Against Religion in Violation of the Federal Free Exercise Clause."
If one concludes that the Florida Establishment Clause has more weight than the Florida Free Exercise Clause, then one must necessarily erroneously conclude that the Florida Free Exercise Clause has less weight and the required balancing and resulting neutrality is eliminated. There is no legal basis to suggest that Florida's citizens have fewer rights under their Free Exercise Clause such that neutrality is lost. To the contrary, the Florida Supreme Court has consistently required neutrality in protection of religious exercise. For example, in Johnson, the Florida Supreme Court noted that the homes for the aged were owned by non-profit organizations who were properly licensed, and stated that "[t]o exempt all homes complying with the statute, except church-related homes, would indeed be discriminatory and inconsistent with the obvious intent and secular aims of the Legislature." 239 So.2d at 261-62 (emphasis added).
The majority's opinion eliminates the protection for religious organizations against discrimination that the Florida Free Exercise Clause and the Florida Supreme Court's decision in Johnson affords them. If the legislature had written a statute that provided for vouchers but explicitly excluded religious organizations from participating in the program, the statute would be constitutional under the majority's ruling even though Florida's Free Exercise Clause prohibits "penalizing" religion. Similarly, if religious organizations were excluded from property tax and sales tax exemptions although other charitable organizations received those benefits, those exclusions would be constitutionally permissible under the majority's ruling. Florida's Free Exercise Clause is being written out of the Florida Constitution because the prohibition against "penalizing" religion is being ignored.
The Florida Constitution should not be construed in a manner that tips the scales of neutrality in favor of more restrictions and less free exercise of religion. I decline to do so.

Conclusion
I conclude that the trial court erred by granting final summary judgment in favor of appellees because the Opportunity Scholarship Program, section 229.0537, Florida Statutes (1999), does not violate Article I,  3 of the Florida Constitution. Therefore, I respectfully dissent.
BARFIELD, KAHN, LEWIS, and HAWKES, JJ., concur.
NOTES
[1] These organizations are the Florida State Conference of Branches of the NAACP, the Citizens' Coalition for Public Schools, the Florida Congress of Parents and Teachers, Inc., and the League of Women Voters, Inc.
[2] Article IX, section 1 of the Florida Constitution in its entirety provides:

The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require.
[3] Although the parties engaged in discovery and developed a factual record, the constitutional challenge here remains a facial challenge. A facial constitutional challenge under the Establishment Clause typically occurs without "a record as to how the statute had actually been applied." Bowen v. Kendrick, 487 U.S. 589, 600-01, 108 S.Ct. 2562, 2569-70, 101 L.Ed.2d 520 (1988); see also Reno v. Flores, 507 U.S. 292, 300-01, 113 S.Ct. 1439, 1446, 123 L.Ed.2d 1 (1993)(explaining that a facial challenge is assessed without reference to factual findings or evidence of particular applications). "Depending on the nature of the statute and the basis for the constitutional challenge, ... the issue of facial constitutionality can be a mixed question of fact and law. When the constitutional issue is a mixed question of fact and law, the parties need to present evidence." Department of Health and Human Servs. v. Cox, 627 So.2d 1210, 1212 (Fla. 2d DCA 1993), approved in part, quashed in part, 656 So.2d 902 (Fla.1995). In a facial challenge, the court begins by using the facts before it to determine whether the statute is valid on its face. Travis v. State, 700 So.2d 104, 106 (Fla. 1st DCA 1997). Here, the trial court found that there were no disputed material facts, and the parties do not contend to the contrary. Further, the trial court declared the entirety of section 229.0537 unconstitutional on its face, not just the application of the statute to religious schools.
[4] In his concurring and dissenting opinion, Judge Wolf urges this court to declare unconstitutional only the part of the OSP which provides aid to sectarian schools. The appellants, however, do not argue that the order on appeal is too broad in its scope, that the constitutional issue should be limited to an as-applied challenge, or that the OSP statute is severable. See Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 506, 105 S.Ct. 2794, 2803, 86 L.Ed.2d 394 (1985)("Partial invalidation would be improper if it were contrary to legislative intent in the sense that the legislature had passed an inseverable Act or would not have passed it had it known the challenged provision was invalid."); Schmitt v. State, 590 So.2d 404, 415 (Fla.1991), cert. denied, 503 U.S. 964, 112 S.Ct. 1572, 118 L.Ed.2d 216 (1992)(quoting Cramp v. Bd. of Pub. Instruction, 137 So.2d 828, 830 (Fla.1962)("When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.")); see generally Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L.Rev. 235 (1994)(analyzing distinction between as-applied and facial challenges). Unlike Judge Wolf, we cannot say that the Florida Legislature intended the OSP statute to be severable or that the legislature would have adopted the OSP without vouchers being provided to sectarian schools.
[5] The Establishment and Free Exercise Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...."
[6] In the final summary judgment under review, the trial court stated:

Article I,  3 has three, specific prohibitions or restraints upon government. The only portion of the provision which has relevance to the remaining challenge in the instant case is found in the third sentence, wherein the people of Florida have established that,
"No revenue of the state or any political subdivision or agency thereof shall be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution."
The language utilized in this provision is clear and unambiguous. There is scant room for interpretation or parsing. When reviewing a provision of the Constitution or a statute, courts are duty bound to give plain meaning to the words and phrases being reviewed; and conversely are not permitted to fashion or employ a strained construction of the Florida Constitution that is not countenanced under the law.
[7] In response to several states which had provided public funding for Catholic schools, President Ulysses S. Grant, in his 1875 State of the Union Address, called for a constitutional amendment to expressly prohibit the payment of public funds to support religious institutions. See Toby J. Heytens, School Choice and State Constitutions, 86 Va. L.Rev. 117, 131-32 n. 77 (2000). Thereafter, Congressman James G. Blaine sponsored an amendment which stated:

No state shall make any law respecting an establishment of religion, or prohibiting the free exercise thereof; and no money raised by taxation in any State for the support of public schools, or derived from any public fund therefor, nor any public lands devoted thereto, shall ever be under the control of any religious sect; nor shall any money so raised or lands devoted be divided between religious sects and denominations.
Id. at 132; see also Joseph P. Viteritti, Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law, 21 Harv. J.L. & Pub. Pol'y 657, 671 n. 64 (1998). The proposed amendment failed in the senate, id. at 671, but Blaine's efforts gave rise to the adoption of no-aid provisions in various state constitutions. See John C. Jefferies, Jr., and James E. Ryan, A Political History of the Establishment Clause, 100 Mich. L.Rev. 279, 305 (2001).
[8] Professor Mark Edward DeForrest asserts that Blaine-era provisions are contained "in roughly thirty state constitutions." Mark Edward DeForrest, "An Overview and Evaluation of State Blaine Amendments: Origins, Scope and First Amendment Concerns," 26 Harv. J.L. & Pub. Pol'y 551, 576 (2003); see also Joseph P. Viteritti, Reading Zelman: The Triumph of Pluralism and its Effects on Liberty, Equality, and Choice, 76 S. Cal. L.Rev. 1105, 1146 (2003); Frank R. Kemerer, State Constitutions and School Vouchers, 120 Ed. Law Rep. 1 (1997).
[9] Whether the Blaine-era amendments are based on religious bigotry is a disputed and controversial issue among historians and legal scholars. Certain commentators contend that the original Blaine-era no-aid provisions were based in part on anti-Catholic religious bigotry. See DeForrest, 26 Harv. J.L. & Pub. Pol'y at 559-73; Joseph P. Viteritti, Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law, 21 Harv. J.L. & Pub. Pol'y 657, 663-80 (1998). Other commentators argue, however, that anti-Catholic bigotry did not play a significant role in the development of Blaine-era no-aid provisions in state constitutions. See Barclay Thomas Johnson, Credit Crisis to Education Emergency: The Constitutionality of Model Student Voucher Programs Under the Indiana Constitution, 35 Ind. L.Rev. 173, 200-203 (2001)(indicating that in 1850, less than six percent of Indiana inhabitants were immigrants and fewer still were Catholics. The Indiana aid provision was not "a remnant of nineteenth century religious bigotry promulgated by nativist political leaders who were alarmed by the growth of immigrant populations and who had a particular disdain for Catholics."). Chief Justice Rehnquist noted in Locke that

[t]he amici contend that Washington's Constitution was born of religious bigotry because it contains a so-called "Blaine Amendment," which has been linked with anti-Catholicism.... Neither Davey nor amici have established a credible connection between the Blaine Amendment and Article I,  11, the relevant constitutional provision. Accordingly, the Blaine Amendment's history is simply not before us.
Locke, 124 S.Ct. at 1314 n. 7 (citations omitted). Similarly, here, there is no evidence of religious bigotry relating to Florida's no-aid provision. Even if the no-aid provisions were "born of bigotry," Mitchell v. Helms, 530 U.S. 793, 829, 120 S.Ct. 2530, 2552, 147 L.Ed.2d 660 (2000), such a history does not render the final sentence of article I, section 3 superfluous. Significantly, nothing in the proceedings of the CRC or the Florida Legislature indicates any bigoted purpose in retaining the no-aid provision in the 1968 general Revision of the Florida Constitution.
[10] The term "sectarian institution" has not been defined in the context of article I, section 3. In their briefs, the parties utilize the concept of "pervasively sectarian." It certainly might be logical to adopt the "pervasively sectarian" standard developed in federal Establishment Clause jurisprudence. In Roemer v. Board of Public Works of Maryland, 426 U.S. 736, 759, 96 S.Ct. 2337, 2351, 49 L.Ed.2d 179 (1976), the court accepted the definition of a "pervasively sectarian" organization as being one "so permeated by religion that the secular side cannot be separated from the sectarian." See also Bowen v. Kendrick, 487 U.S. at 610, 108 S.Ct. at 2574. Because the parties agree that sectarian schools receive funds from OSP vouchers, however, we have no need to define "sectarian" for the purpose of our opinion. In addition, whether a school is "pervasively sectarian" would seem to raise factual issues that have not been addressed by the trial court. See, e.g., id., 487 U.S. at 620-21, 108 S.Ct. at 2580-81.
[11] Contrary to the assertion of the dissent, see dissent footnote 5, Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989), does not change the distinction, in an Establishment Clause context, between a direct payment of public funds and more indirect benefits such as tax exemptions and revenue bonds. In Bullock, the Court invalidated a Texas statute that exempted from the state sales tax those "periodicals that are published or distributed by a religious faith and that consists wholly of writings promulgating the teaching of the faith and books that consist wholly of writings sacred to a religious faith." 489 U.S. at 5, 109 S.Ct. 890. Justice Brennan's plurality opinion based the invalidity on Establishment Clause grounds. Id. at 8-25, 109 S.Ct. 890. Walz v. Tax Commission sustained a property tax exemption that applied to religious properties and to real estate owned by a wide array of nonprofit organizations. Notwithstanding Justice Scalia's assertion in the Bullock dissent, Bullock, 489 U.S. at 43, 109 S.Ct. 890, cited by the dissent here, see dissent footnote 5, the Bullock majority did not address the distinction or reject the dicta in Walz quoted in the text above.
[12] The three Establishment Clause tests set forth in Lemon are: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968); finally, the statute must not foster `an excessive government entanglement with religion.' Walz, [397 U.S.] at 674, 90 S.Ct. at 1414." Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111.
[13] Our decision in Todd v. State, 643 So.2d 625 (Fla. 1st DCA 1994), does not hold to the contrary. In that case, we compared the federal Establishment Clause with the Florida Establishment Clause, which is contained in the first sentence of article I, section 3. In Todd we said: "The Establishment Clause of the First Amendment to the United States Constitution provides: `Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' Article I, Section 3, of the Florida Constitution is substantially the same. It provides: `There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof.'" Id. at 628 (footnote omitted). In Todd, we did not compare the entirety of article I, section 3 with the entirety of the portion of the First Amendment pertaining to religion.
[14] Resolution of a challenge under Florida's Establishment Clause, which is found in the first sentence of article I, section 3, essentially mirrors the resolution of a federal Establishment Clause challenge. See Johnson v. Presbyterian Homes, 239 So.2d at 261; Silver Rose, 646 So.2d at 251; Rice v. State, 754 So.2d at 883. However, one court has observed that "the very text of the Florida Constitution suggests that it affords less absolute protection than that provided by the United States Constitution. See Art. 1  3, Fla. Const. (`There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety.')." Warner v. City of Boca Raton, 267 F.3d 1223, 1226 n. 3 (11th Cir.2001).
[15] The parties to this appeal have conceded that the OSP program does not violate the federal Establishment Clause. There is no need, therefore, to engage in an analysis under Zelman v. Simmons-Harris, as the dissent does. The dissent seeks to graft Zelman's "true private choice" concept into the no-aid provision. Under Zelman, when government aid reaches a religious school only through the exercise of a "true private choice," then the program providing the aid "is not readily subject to challenge under the [federal] Establishment Clause." 536 U.S. at 652, 122 S.Ct. 2460 (emphasis added).
[16] The Washington Constitution provides in pertinent part that "no public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment." Wash. Const. Art. I,  11. Witters, 474 U.S. at 484, 106 S.Ct. at 750. We note that the Florida no-aid provision is "far stricter" still than this provision in the Washington Constitution. Although the Washington provision prohibits appropriations in support of "any sectarian institution," it does not contain a prohibition on indirect aid.
[17] As we discussed in footnote 10, supra, we do not address whether "pervasively sectarian" is a concept included within the Florida no-aid provision.
[18] Wash. Rev.Code  28 B.10.814 provides that "[n]o aid shall be awarded to any student who is pursuing a degree in theology." Locke, 124 S.Ct. at 1310.
[19] Article I, section 11 of the Washington Constitution provides in pertinent part that: "No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment...." Locke, 299 F.3d at 750 n. 2.
[20] We note that the First Circuit Court of Appeals has also held that a state program providing vouchers only to non-sectarian schools did not violate the Free Exercise Clause. Strout v. Albanese, 178 F.3d 57, 65 (1st Cir.), cert. denied, 528 U.S. 931, 120 S.Ct. 329, 145 L.Ed.2d 256 (1999). In so holding, the court applied a different standard than the Ninth Circuit in Locke. Id. In Strout, the First Circuit considered the constitutionality of a Maine statute authorizing direct tuition grants to private non-sectarian schools, but not to religious schools. Id. at 59. The Strout holding was based, in part, on the court's determination that, unlike the ordinance in Lukumi, Maine's statute did not reflect a "substantial animus" toward religion or result in a substantial burden on a central belief or practice. Id. at 65. In addition, the court reasoned that the government's action did not prohibit the exercise of religion of the parents challenging the program, because attending a secular school is a matter of personal preference, not a "central tenet or practice of their faith." Id. Further, the Maine program did not prevent the plaintiffs from attending religious schools. Rather, "[a]ll it means is that the cost of religious education must be borne by the parents and not the state." Id. Thus, Maine was not constitutionally mandated to extend tuition grants to sectarian schools. See also Eulitt v. Maine, 386 F.3d 344 (1st Cir.2004).
[21] In Lukumi, the United States Supreme Court explained:

A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests.
* * *
The Free Exercise Clause commits government itself to religious tolerance.... Legislators may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices....
Lukumi, 508 U.S. at 546-7, 113 S.Ct. at 2233-4 (internal quotes omitted; italics added).
As discussed above, the majority in Locke rejected the argument that the Washington program violates the principles of Lukumi. Furthermore, because we are holding the OSP unconstitutional in its entirety, and not just its application to sectarian schools, our decision is one of general application and does not specifically target religion for disparate treatment.
[22] While the majority opinion does rest on a provision of the Florida Constitution ÔÇö Article I, section3 ÔÇö we have recognized an overlap between that provision and the Establishment Clause of the First Amendment. See Silver Rose Entm't, Inc. v. Clay County, 646 So.2d 246, 251 (Fla. 1st DCA 1994) ("These three [federal constitutional] issues must also be addressed in deciding the Florida constitutional question."). The dissenting opinion argues, moreover, that the ground on which the majority opinion rests requires decision of another federal constitutional question under the Free Exercise Clause. Affirming on the basis of Article IX, section 1 would avoid even the possibility of having to decide these federal constitutional claims. See generally Robert F. Williams, State Constitutional Law 332-48 (3d ed. 1999) ("The Sequence of Constitutional Arguments").
[23] Now found at section 1002.38, Florida Statutes (2003).
[24] See also, State v. Sarasota County, 549 So.2d 659 (Fla.1989) (determining charter provision acted as a limitation on county issuing bonds without referendum); City of Miami Beach v. Fleetwood Hotel, Inc., 261 So.2d 801 (Fla.1972) (holding that a municipality's charter, not unlike the state constitution, is the paramount governing instrument of the municipality and the fundamental law of the citizens who are served by the municipality).
[25] Judge Van Nortwick dismisses Gidman because that case involved an analysis of the home rule power of the municipality. As demonstrated by this quote, the case not only involved an analysis of home rule, but also the application of the city charter provision.
[26] While facial challenges are allowed in cases involving first amendment freedom of speech issues, this concept should not be expanded to this type of case.
[27] While I disagree with portions of both Judge Van Nortwick's majority opinion and Judge Polston's dissent, I commend them for their thorough scholarly handling of the subject matter.
[28] The explicit language in article I, section 3 is clear and unambiguous. Public revenue is not to be used to aid any sectarian institution. There is no language limiting this provision to schools. The first precept of constitutional interpretation is whether that language is clear and unambiguous; if so, it should be interpreted as written. Florida League of Cities v. Smith, 607 So.2d 397, 400 (Fla.1992) ("[T]he law is settled that when constitutional language is precise, its exact letter must be enforced and extrinsic guides to construction are not allowed to defeat the plain language."); In re Advisory Opinion to Governor Request of June 29, 1979, 374 So.2d 959, 964 (Fla.1979) ("In construing provisions of the constitution, each provision must be given effect, according to its plain and ordinary meaning."); City of St. Petersburg v. Briley, Wild & Assoc., Inc., 239 So.2d 817, 822 (Fla.1970) ("If the language is clear and not entirely unreasonable or illogical in its operation we have no power to go outside the bounds of the constitutional provision in search of excuses to give a different meaning to words used therein.").
[29] Such a clause allows the invalidation of unconstitutional provisions of a statute, while allowing the independent and constitutional provisions to remain valid. See Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985).
[30] Part three of the test, analyzing the separability of the good and bad features, is extremely subjective; at the very least the case should be remanded to the trial court to make this factual determination.
[31] The Legislature repealed section 229.0537 in 2002, see Ch.2002-387,  1058, at 4152, Laws of Fla., and reenacted it into section 1002.38, Ch.2002-387,  103, at 3304, Laws of Fla.
[32] In 1885, the relevant language in the Declaration of Rights,  6, Fla. Const. stated: "Section 6; No preference shall be given by law to any church, sect or mode of worship and no money shall ever be taken from the public treasury directly or indirectly in aid of any church, sect or religious denomination or in aid of any sectarian institution." (Emphasis added). There were no significant changes in this language when the Constitution was next revised in 1968 and as it currently exists. See Art. I,  3, Fla. Const.; Johnson v. Presbyterian Homes of Synod of Fla., Inc., 239 So.2d 256, 258-59 (Fla.1970).
[33] "Revenue" of a government is a broad and general term applicable to collections and receipts from whatever source and in whatever manner. See Black's Law Dictionary 1185 (5th ed.1979).
[34] See Committee for Pub. Educ. and Religious Liberty v. Nyquist, 413 U.S. 756, 789-91, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (treating system for income tax benefits the same under the Establishment Clause, regardless of whether they should be labeled a tax deduction, tax credit, or reimbursement through a grant; "the constitutionality of this hybrid benefit does not turn in any event on the label we accord it").
[35] In Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989), the United States Supreme Court held that a sales tax exemption benefitting only religious organizations was unconstitutional because the statute was not written broadly in a neutral manner as in Walz v. Tax Comm'n, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). In its Establishment Clause analysis, the Court declined to make a distinction between tax exemptions and subsidies as suggested by the dissent in Texas Monthly, citing Walz. Texas Monthly, 489 U.S. at 13 n. 3, 14, 33-45, 109 S.Ct. 890 (Scalia, J. dissenting, with whom Rehnquist, C.J., and Kennedy, J., concurs). The Court stated that "[e]very tax exemption constitutes a subsidy that affects nonqualifying taxpayers, forcing them to become `indirect and vicarious "donors."' Bob Jones University v. United States, 461 U.S. 574, 591, 103 S.Ct. 2017, 2028, 76 L.Ed.2d 157 (1983). See also Regan v. Taxation with Representation of Wash., 461 U.S. 540, 544, 103 S.Ct. 1997, 2000, 76 L.Ed.2d 129 (1983)." 489 U.S. at 14, 109 S.Ct. 890. For the same reasons, this court should decline to treat subsidies differently from exemptions. This statute is broadly written in a neutral manner.
[36] Sheldon Jackson Coll. v. State, 599 P.2d 127 (Alaska 1979). The program at issue in Alaska does not resemble Florida's program. Instead, the program allowed students to receive state grants for the tuition amounts charged by private colleges that exceeded the tuition of public colleges in the same area.
[37] This "fourth prong" has not always been followed by this court. In Todd v. State, 643 So.2d 625, 628, 630 (Fla. 1st DCA 1994), the court noted the three prongs under Lemon, and held that although there was some indirect benefit to religious organizations from the statute making it a felony to deface a church, synagogue, mosque or other place of worship, these incidental benefits are not unconstitutional under the United States or Florida Constitution.
[38] The Florida Supreme Court in Johnson, as the majority correctly points out, analyzed the no-aid language as part of the Establishment Clause analysis of Article I,  3, consistent with federal constitutional Establishment Clause jurisprudence. This supports my view that the Establishment Clause in Article I,  3, including the no-aid language, as interpreted by the Florida Supreme Court, means the same as the Establishment Clause in the United States Constitution, as interpreted by the United States Supreme Court. Johnson should be followed, and this Court should rule the program constitutional.
[39] A discriminatory act cannot be protected by eliminating the whole program. Could the state cure a discriminatory act of not hiring or terminating an individual because of race by simply eliminating the employment position? Obviously not. See, e.g., Minton v. Am. Bankers Ins. Group, Inc., 2003 WL 21303330, at *1 (11th Cir. Feb.6, 2003) (ruling that "[a]lthough his position was eliminated, Minton can show a prima facie case of discrimination if he can demonstrate that his position was abolished for discriminatory reasons, and that its elimination was merely a pretext to shroud the Defendant's discriminatory intent in releasing him").
[40] It is the trial court's judgment interpreting Article I,  3, affirmed by the majority's ruling, that violates the United States Constitution Free Exercise Clause. Accordingly, the trial court's ruling, not legislative or executive action, is the unconstitutional state action that is subject to review under this provision. See NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 463, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (holding that a trial court order requiring production of membership records violated the United States Constitution's Due Process Clause; "It is not of moment that the State has here acted solely through its judicial branch, for whether legislative or judicial, it is still the application of state power which we are asked to scrutinize."); Kreshik v. Saint Nicholas Cathedral, 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960) (stating that "whether legislative or judicial, it is still the application of state power which we are asked to scrutinize"); Shelley v. Kraemer, 334 U.S. 1, 18, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (stating that "it has been the consistent ruling of this Court that the action of the States to which the [Fourteenth] Amendment has reference includes action of state courts and state judicial officials"); Morgan v. State, 337 So.2d 951, 955 n. 9 (Fla.1976) (stating that "[t]he judiciary, a branch of government coequal with the executive and the legislature, is no less subject to constitutional strictures against governmental interference with First Amendment rights"); State ex rel. Lawson v. Woodruff, 134 Fla. 437, 184 So. 81, 84 (1938) (stating that the Fourteenth Amendment applies to all state action whether legislative, executive, judicial, administrative, municipal, or ministerial).
[41] The majority suggests that we should ignore the Florida Free Exercise Clause in our de novo interpretation of the Florida Establishment Clause, even though it appears in the same section of the Constitution, because it was not argued to the trial court. We would not ignore authoritative cases and related statutory sections when interpreting statutory and constitutional provisions because they were not cited in the court below. We should not ignore constitutional language that appears in the same section of the Constitution as the provision we are examining, particularly when it is well settled that the Establishment and Free Exercise Clauses are innately intertwined.
[42] If there is not less play in the joints, the Opportunity Scholarship Program fits within the play permitted by the Florida Constitution. See Johnson, 239 So.2d at 259-60 (reviewing a challenge under the United States and Florida Constitutions, quoting Walz, noting there is "room for play in the joints productive of a benevolent neutrality"). It is beyond dispute that the Opportunity Scholarship Program is productive of a benevolent neutrality. Accordingly, the program is within Florida's constitutional play in the joints and should be upheld.